**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**AVCO FINANCIAL CORP., Anthony Vartuli and J. Michael Gent, Defendants.**

**No. 97 CIV. 3119 (JFK).**

United States District Court, S.D. New York.

June 29, 1998.

Regional Counsel Ernesto Marrero, Jr., Division of Enforcement, Commodity Futures Trading Commission, New York City (Karl D. Cooper, Beth R. Morgenstern, Kathryn Kwak, Andrew Cunningham, of counsel), for Plaintiff Commodity Futures Trading Commission.

Schoeman, Marsh & Updike, LLP, New York City (Michael E. Schoeman, David Black, of counsel) for Defendants Anthony Vartuli and J. Michael Gent.

### FINDINGS of FACT and CONCLUSIONS of LAW

KEENAN, District Judge.

#### The Parties

Plaintiff Commodity Futures Trading Commission ("the Commission") is an independent federal regulatory agency which is charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act, 7 U.S.C, §§ 1 et seq. (1994), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (1997). Under the CEA, all commodity trading ad-

visors must register with the Commission. *See* 7 U.S.C. § 6m.

Defendant AVCO Financial Corp. ("AVCO") is a corporation incorporated in Connecticut that has transacted business from 6, 8 and 10 Grigg Street in Greenwich, Connecticut. AVCO's business is to provide investment trading advice and AVCO has never been registered with the Commission in any capacity.

Defendant Anthony Vartuli is the president and sole shareholder of AVCO. From August 1991 through April 1, 1994, Vartuli was a vice president of Greenwich Futures Corp., which was registered with the Commission as a commodity trading advisor until September of 1995. During this time, Vartuli was listed with the Commission as a principal of Greenwich Futures Corp. He has never been registered with the Commission in any capacity.

Defendant Michael Gent is the developer of AVCO's Recurrence software. Gent has never been registered with the Commission in any capacity.

### The Action

This civil enforcement action brought by the Commission is based upon Defendants' manufacture, advertisement and sale of a computer software program called "Recurrence." The Recurrence software program analyzes market conditions throughout the day and generates specific recommendations to advise a customer to buy, sell or exit positions in exchange-traded futures contracts on Swiss francs and Japanese Yen. The Commission charges that, through false and misleading representations regarding Recurrence's past performance in trading futures contracts, Defendants fraudulently induced customers to purchase the Recurrence software program and then to place futures trades pursuant to Recurrence's recommendations, in violation of 7 U.S.C. §§ 6b & 6o of the Commodity Exchange Act ("CEA"), and 17 C.F.R. § 4.41 of the Commission's regulations promulgated thereunder (the "Regulations"). The Commission also charges that

Defendants violated the CEA by providing commodity trading advice without being registered with the Commission as a commodity trading advisor ("CTA") in violation of 7 U.S.C. § 6m. The Commission seeks a permanent injunction barring future violations of the CEA by defendants, as well as awards of disgorgement, restitution, rescission and civil monetary penalties.

On August 25, 1997, AVCO filed a voluntary petition for bankruptcy. However, in a September 29, 1997 decision, this Court ruled that the bankruptcy filing did not automatically stay this action as against AVCO because, pursuant to 11 U.S.C. § 362(b)(4), this is an action by a governmental unit to enforce the governmental unit's regulatory power and therefore exempted from the bankruptcy stay. *See CFTC v. Avco Fin. Corp.*, 979 F.Supp. 232, 235 (S.D.N.Y.1997). The Court entered a default judgment against AVCO on February 2, 1998 for failure to appear in this action.

The Court conducted a bench trial in this matter between February 2, 1998 and February 11, 1998. Because this Court's order of February 2, 1998 deemed AVCO in default, the trial was conducted as an inquest as to AVCO for the Court to make such findings of fact and conclusions of law necessary to enter judgment imposing injunctive relief against AVCO and to determine the appropriate ancillary relief, pursuant to Fed.R.Civ.P. 55(b)(2).

### Findings of Fact

#### A. The founding of AVCO

In 1987 when he was two years out of high school, Anthony Vartuli founded Taurus Group, Inc., a Connecticut corporation, *see* Tr. at 570, 574,[1] having first founded the unincorporated Taurus Group in 1985. Taurus' purpose, as set forth in its certificate of incorporation, was "to provide investment advice in stocks, options and commodities." Tr. at 572; PX 105. Vartuli later changed the name of Taurus, Inc. to AVCO Financial Corp, but the central purpose remained the

---

1. Tr. refers to transcript page; PX refers to Plaintiff's exhibit; JPTO refers to the joint pre- trial order.

same. *See* Tr. at 574; PX 105. Vartuli was the president and sole shareholder of Taurus, and remains the president and sole shareholder of AVCO. *See* Tr. at 517–18.

Michael Gent is a doctor of dentistry, although due to injuries suffered in an automobile accident in his final year of dental school, he has never practiced dentistry. *See* Tr. at 352–53. Following dental school, Gent gained a knowledge of commodity futures trading by reading industry publications and magazines such as *Futures, Options, Futures Industry,* and *Technical Analysis of Stocks and Commodities. See* Tr. at 284–85.

AVCO began doing business in 1987 by marketing an applications manual for day trading techniques in the future market. The manual called *Day Trading Techniques* "showed traders what to do, how to apply technical indicators and bar chart analysis to day trading in futures" and was in book form rather than computer software form. Tr. at 518–19. Vartuli and Gent first came into contact in 1988, when Gent purchased a manual for day trading from AVCO. *See* Tr. at 521. This led to Gent coming to work at AVCO. To do his work for AVCO, Gent moved to Greenwich, Connecticut and lived there from 1988 until March 18, 1994. His work at AVCO was full-time and he worked 15 hours a day, 7 days a week for $20,000 annually. *See* Tr. at 301–02. Gent did research and provided technical support for AVCO. *See* Tr. at 301–03.

## B. The Recurrence System

In 1989, Gent helped Vartuli put together the original Recurrence system. The original Recurrence system, which related to day trading, was in book form rather than in the form of computer software, and it was offered to new customers for $1,500. *See* Tr. at 522–23. This Recurrence system indicated to customers what market patterns to look for that were historically profitable, and the customer/trader would monitor the market based upon the Recurrence manual and generate for himself the signal as to whether to buy, sell or exit a position. *See id.* With this system, "the trader had to have a quote system and a realtime charting and actually

do all the work himself" in determining specific trades. *Id.*

In 1990, Dr. Gent rewrote the Recurrence manual to make it easier to understand. The revised manual was then offered to the public as Recurrence II and sold by AVCO for $2,500. *See* Tr. at 527. Recurrence II was sold from late 1990 until May 1993 and was sold in the form of a book and calculator. In 1993, Recurrence II was replaced by Recurrence III, which was primarily in the form of computer software rather than a book. The idea for Recurrence III originated in 1991 when AVCO was approached by a computer programmer who wanted to convert Recurrence into software. The programmer, working with Dr. Gent, converted the Recurrence II manual into software. This software, together with a manual that incorporated Recurrence II and instructions on using the software, was offered by AVCO as Recurrence III. The price was nominal for previous customers and $3,500 for new customers. *See* Tr. 528–30. These first three Recurrence programs gave recommendations as to trading in Swiss franc futures contracts, *see* Tr. at 289, 299, as did Recurrence IV. *See* PX 14. Recurrence V, which AVCO began to sell to the public in 1996, generated trading recommendations regarding Japanese yen futures contracts. *See* PX 14.

In the joint pre-trial order, the parties described the Recurrence software systems as

a fully computerized system which provides users with specific instructions, appearing on a computer screen, on trading Swiss franc futures contracts traded on the [Chicago Mercantile Exchange]. The Defendants' customers pay AVCO's licensing fee, and, if they wish to follow the instructions given by the Defendants' system themselves, install the Defendants' computer program on their personal computers, procure a market reporting service to feed current market prices to the computer, and then act on the instructions given by the Defendants' system. The Defendants' system ostensibly analyzes incoming data and instantly signals its recommendation with both a screen message and audio alert. The message gives a customer a

specific buy or sell recommendation, as well as a specific stop and profit objective. The Defendants' customers then call in the order indicated on the screen. The system is advertised as monitoring the market and the customer's position as the trading day progresses. When additional instructions are warranted, Defendants' system creates an additional on-screen message and [a]udio alert for the user.

JPTO at 5.

In addition to providing specific trading advice through the Recurrence software, AVCO also communicated trading advice to Recurrence customers over the telephone. For instance, some Recurrence customers were told that, even though the Recurrence software would signal trades during the month of December, no trades should be made during that month. *See* Love Dep. at 36–37; Langford Dep. at 31–33. Others were advised not to trade on days following a day during which the Swiss franc market had traded within various ranges. *See* Love Dep. at 52–55; Stewart Dep. at 18–22. Some customers called AVCO to confirm whether the recommendations generated by Recurrence running on their computers should be followed. In some cases, customers were told that they should place the trades signaled by Recurrence and, in other cases, they were told not to place the recommended trade. *See* Tr. at 48–50; Love Dep. at 52–55; Stewart Dep. at 18–22, 62–64; Tr. at 515. Customers were able to get this advice by calling AVCO at the telephone number provided in the Recurrence promotional materials and instruction booklet. *See* Stewart Dep. at 18–19, 63; Tr. at 48.

For customers who were unable to monitor the market and the Recurrence system's recommendations during trading hours, AVCO provided them with a list of "authorized brokers" who utilized the Recurrence system and could place trades based upon the system's recommendations for those customers who wanted to open accounts. *See* PX 51 at 6; Tr. at 200–01, 395–97, 595; Langford Dep. at 17–18.

### C. AVCO's advertisements for the Recurrence system

With regard to AVCO's advertisements for the Recurrence system and its solicitation of potential customers, the joint pre-trial order provides:

From at least 1991 until the present, AVCO has solicited members of the general public to purchase various versions of Recurrence, and has solicited such members of the public to purchase Recurrence by advertising in *Futures Magazine, Compuserve Magazine, Technical Analysis of Stocks and Commodities Magazine, Futures Industry Magazine,* and through radio solicitations, direct mail solicitations to prospective customers, and direct phone solicitations to individuals who respond to the Defendants' initial solicitations.

In addition, at various times in 1995 and 1996, AVCO placed classified advertisements in the "business opportunities" sections of local newspapers around the United States, including *The New York Times, The Los Angeles Times,* the *Phoenix Republic Gazette, Investor's Business Daily,* the *Orange County Register,* the *Denver Post, The Washington Post,* the *Indianapolis Star,* the *Minneapolis Star Tribune,* the *St. Louis Post Dispatch,* the *Atlanta Journal,* the *Chicago Sun–Times,* the *Chicago Tribune,* the *Charlotte Observer,* the *New Orleans Times Picayune,* the *Boston Globe, The Wall Street Journal,* the *Cleveland Plain Dealer,* the *Columbus Dispatch,* the *Philadelphia Inquirer,* the *Dallas Morning News,* and the *Houston Chronicle.* These classified advertisements advertised a high-income potential home-based business. For example, in February of 1996, these advertisements read: "CURRENCY FUTURES TRADING. Home based business w/Unlimited Income Potential. Monitor/Trade for your Customers & Ours. No Selling! No experience! Limited Oppty. w/ Support. Call 1–800–238–0491." (Emphasis in original.) Advertisements which ran in May–August of 1996 stressed the unlimited potential of becoming a "private currency trader."

JPTO at 6.

From 1991–1997, AVCO's advertisements for the Recurrence software system claimed

high profits as a result of trading in accordance with Recurrence's recommendations, trumpeted a high percentage of winning trades recommended by Recurrence, and emphasized the minimal risk in trading futures based upon Recurrence's recommendations. Some examples of these claims include: "Recurrence III makes money automatically," PX 14; "Between Jan. 1, 1989 and May 1, 1995, trading only Swiss Franc futures, the system turned a $10,000 trading account into a $544,704 fortune—a return of 833% per year!" PX 14; Recurrence earned a "profit on more than 80% of its trades," JPTO at 8, PX 14; "Recurrence has made a profit on more than 75% of its trades ... trading only Swiss franc futures the system made more than $565,750 on a starting equity of $10,-000," JPTO at 8.

For potential customers who telephoned AVCO after seeing the Recurrence magazine and newspaper advertisements, AVCO sent promotional materials by mail, fax or overnight courier. See Love Dep. at 16–20; Tr. at 57–64, 190, 236–39, 386–89; PX 35; PX 42; PX 101. These materials included claims such as the following: "OVER 6-YEARS OF REALTIME DAYTRADING PROFITS UTILIZING THE RECURRENCE SYSTEM. The following results were attained by daytrading 1–Swiss Franc futures contract (NO Pyramiding!) over the last 6 + years.... $133,513 Gross Profit $97,463 NET Profit," PX 101; "Worst quarter on Record $450 per contract," "largest losing trade just $375," JPTO at 9; "Sound too good to be true? If you're serious about making money trading the markets, see the enclosed verified performance summary showing how Recurrence IV turned $2,500 into well over $130,000 trading only one Swiss Franc futures contract," JPTO at 8. Some potential customers who called AVCO after reading the ads or receiving the promotional materials spoke to Anthony Vartuli. They questioned him about the program and the statements as to profitability in the ads. Vartuli reassured such potential customers as to the accuracy of the statements in the ads and told them that the advertised Recurrence results were based on actual trading. See, e.g., Tr. at 139–46, 187–92, 234–46.

AVCO's advertising proved fairly successful because, at trial, the Commission produced 1,030 customer order forms for AVCO's Recurrence systems which represented a total revenue for Recurrence sales of $4,148,572. See Tr. at 427–28; PX 85. The Court finds that the representations in the Recurrence advertisements and promotional materials, as well as Vartuli's representations to potential customers over the telephone regarding Recurrence's performance history, induced customers to purchase the Recurrence program and make trades pursuant to Recurrence's recommendations. See, e.g., Tr. at 139–46, 150–53, 187–92, 198–99, 234–46, 250. However, despite the extraordinary claims about the profitability of trading according to Recurrence's recommendations, the basis for the advertised Recurrence performance history claims was hypothetical or simulated trading results, rather than actual trades. See Tr. at 595–97, 606–12; Def.'s Proposed Findings ¶¶ 28–29. The Recurrence advertisements gave no indication that the advertised performance history of the system was based on hypothetical or simulated trading results. See Tr. at 584, 595–97; JPTO at 10. Vartuli authored and/or approved the content of all Recurrence advertisements for publication. See Tr. at 327–28, 547–49, 556, 569–70, 583–84.

## D. Results of actual trading on the system by Recurrence customers

The evidence at trial demonstrated that the results of actual trading in accordance with Recurrence's recommendations were far different from the advertised claims. As Defendants acknowledge in their post-trial submission, "The Commission's customer witnesses generally complained that the results of their use of the Recurrence system was (sic) unsatisfactory when compared with the results reported by AVCO in its advertising." Defs.' Proposed Findings at 8. Rather than generating 800 percent plus profits, as advertised, Recurrence's customers generally suffered losses. See Tr. at 22, 153, 205, 253, 398–99; Axford Dep. at 29; Stewart Dep. at 18. Indeed, AVCO had an account at Prudential Securities which engaged in Swiss franc day trading based in part on Recurrence's recommendations and the account

lost $11,576.92. *See* Tr. 297–98, 460–61; PX 84.

Whether conducted by customers themselves or by an "authorized broker," the Court finds that, contrary to the advertised claims, actual trading in futures pursuant to Recurrence's advice resulted in substantial losses. Between September 8, 1995 and June 24, 1996, Recurrence-guided trading in Swiss franc futures at the Shatkin Arbor Karlov firm led to a total of $348,115.50 in gross trading losses. In addition, customers paid $176,524.84 in commissions. The percentage of winning trades was just 38 percent. *See* PX 1; PX 94; Tr. at 252–53, 440–41, 450–51. Glenn Spann, a futures investigator at the CFTC, testified that between May 9, 1996 and July 29, 1996, 1311 trades recommended by Recurrence at Alaron Trading Corp. generated a total gross loss of $94,113.78, for which customers paid a total of $65,250 in commissions. The percentage of winning trades was 43 percent. *See* Tr. at 456; PX 22; PX 95. During the period from October 6, 1993 to March 30, 1994, Recurrence III recommended trades at Robbins Futures, Inc. generated a total gross trading loss of $61,433.20. The cost to customers was $40,260 in commissions. *See* Tr. at 456–60; PX 15; PX 98.

AVCO customers informed Vartuli about their trading losses and the fact that their experiences with Recurrence were a far cry from the advertised claims about the program. *See, e.g.,* Tr. at 153–57, 161–62, 401–02; Love Dep. at 41–44; Stewart Dep. at 20; PX 32. Indeed, Vartuli even admitted to some disgruntled customers that Recurrence's performance had been poor, *see* Stewart Dep. at 20–22; Tr. at 162; PX 71, or that there were glitches in the program. *See* Tr. at 24–25. Nevertheless, the Court finds that Vartuli continued to make the same claims of the extraordinary profitability of Recurrence in advertisements and still recommended it to customers saying he traded based on Recurrence himself. *See* Tr. at 14–18, 56–67, 153–54, 248–49; PX 71.

## E. Findings as to Vartuli and AVCO

Defendants have sought to maintain that the basis for their performance claims of the Recurrence system was "hypothetical" trading and that customers were given notice of this fact on the order form for the Recurrence system, which was included in the promotional materials sent to potential customers who inquired about the system. The order form, which was on a separate page from the promotional information, contained the following language:

> While the numbers used in this literature are *"Real Time Data"* the CFTC requires the following disclaimer on all market related literature. Hypothetical or Simulated performance results have certain limitations. Unlike an actual performance record, simulated results do not represent actual trading. Also since the trades have not actually been executed the results may have under-or over-compensated for the impact, if any, of certain market factors, such as lack of liquidity. Simulated trading programs in general are also subject to the fact that they are designed with the benefit of hindsight. No representation is being made that any account will or is likely to achieve profits or losses similar to those shown.

PX 35.

The Court concludes that most AVCO customers believed as did those customers who testified at the hearing: that the language was used because the CFTC required it, but that it really had no application to Recurrence software systems in light of the specific statements about Recurrence's performance history in the advertisements and promotional materials, as well as by Vartuli. *See* Tr. at 67–68 (Steciak), Tr. at 142–50 (Kasper), 189–96 (Brisson), 265–67 (Hanson), 394–95 (Dorst). Upon a review of the Recurrence advertisements, the promotional materials and testimony by AVCO customers, the Court finds this to be a reasonable conclusion by customers. Indeed, the Court observes that the Recurrence advertisements in magazines and other publications contained no such disclaimer or notice regarding hypothetical trading. Moreover, even Vartuli admitted that the advertisement in the December 1995 *Futures* magazine that reads "If you're serious about making money trading, call for a Recurrence information kit, with a verified

performance summary showing how the system turned $10,000 into $551,104 trading only Swiss Franc futures," *see* PX 14 at 138, leads the reader to believe that Recurrence "actually did turn $10,000 into . . . $551,000" when in fact that never happened. *See* Tr. at 595–97. As for the Recurrence advertisement in the July 1994 *Futures* magazine issue, *see* PX 14 at 100, Vartuli acknowledged that there is no statement to the effect that the claims relating to the performance of Recurrence IV were "hypothetical." Tr. at 595. This ad contains a graph from 1989 to 1994 purporting to show that between January 3, 1989 and May 15, 1994, Recurrence turned a $2,500 investment in Swiss Franc Futures into $121,000. The Court concludes that this ad, and others like it in evidence, cause the reader to believe that actual trades in the market produced the profits claimed. These claims are false and misleading and the evidence demonstrated that AVCO and Vartuli are clearly responsible for them. Vartuli concedes that he was a controlling person of AVCO, *see* Answer ¶ 48, and the evidence supports such a conclusion. Vartuli made all the key decisions for AVCO with respect to hiring, how money was spent, and the marketing of Recurrence.

With regard to the likelihood of continuing conduct by Vartuli, the Court observes that Vartuli has continued his involvement with currency speculation. Vartuli presently is working at a company called AFX where he is listed as vice-president. AFX conducts spot foreign currency trading and, like AVCO, AFX is located at 8 Grigg Street in Greenwich, Connecticut. *See* Tr. at 92, 598–99.

### G. Findings as to Gent

The question is a much closer one when it comes to the role of Dr. Gent at AVCO and whether he participated in fraudulently inducing customers to engage in futures trades through false claims or whether he provided commodity trading advice. Contrary to the urging of the Commission, the Court found his testimony credible.

There were numerous letters from AVCO to customers—including solicitation letters—that went out apparently with Gent's signature, but they were not actually signed by him or authorized by him. *See* Tr. at 305, 308, 321, 323, 346, 348. Vartuli admitted that he signed Gent's name without Gent's authorization to various AVCO letters and documents. *See* Tr. at 569–70. There, however, exists a document that lists Gent as AVCO vice president, PX 58, which Gent acknowledges signing. *See* Tr. at 356. This is a contract with Robbins Trading Company of Chicago, Illinois dated August 9, 1993 in letter form in which Robbins agrees to market Recurrence III for AVCO, but this has nothing to do directly with the charges brought by the Commission in this case.

■ Both Gent and Vartuli testified that Gent did not solicit customers, did not receive commissions from the sale of Recurrence, and did not deal with customers other than provide them with some technical support in operating the system. *See* Tr. at 301–03, 524, 529, 540. He was not involved in sales. *See* Tr. at 540. Gent's main function at AVCO was the research and writing of the substance of the various Recurrence manuals. *See* Tr. at 290, 521, 539–40. The Commission's contention that Gent was a de facto partner of Vartuli's at AVCO, or a controlling person of AVCO, is simply not substantiated in the record. Although his name was on AVCO ads, this was without Gent's authorization. He complained about this to Vartuli and asked that his name be removed, and he even quit AVCO for a while in 1994. *See* Tr. at 327–30. While the Court recognizes that Gent did have the authority to make trades in AVCO's account at Prudential, *see* Tr. at 291–93, the Court is not persuaded that this demonstrates Gent to be a de facto partner because this trading authority would be consistent with Gent's role in researching for the Recurrence system.

■ The Commission points to two snippets of testimony to argue that Gent participated in the solicitation of customers for AVCO. First, the Commission relies on the following deposition testimony of the customer Joe R. Love:

Q. . . . Did you ever talk to anyone at Avco about what realtime trading meant?

A. I believe so, my best recollection.

Q. Do you know who you talked to?

A. Michael Gent and Anthony.

Q. And what, if anything, did Michael Gent say to you about realtime trading—

A. Well, that—

Q. —if you recall.

A. —it was a profitable system that they were using, using, you know, real money and real dollars.

Q. And when Michael Gent said that to you, what did you think that meant?

A. Well, I—I—it was pretty self-explanatory to me. Real dollars. Realtime trading to me means that you're—you're putting real dollar—you're making real dollar investments.

Love Dep. at 57–58. This testimony may or may not have had something to do with solicitation. The Court finds that the testimony is not specific enough to establish solicitation by a preponderance of the evidence. Second, the Commission urges that testimony from Damian George, who formerly was an auditor for the National Futures Association, establishes solicitation. George testified that, while he at AVCO's Greenwich offices in connection with an audit of another company, he overheard a telephone conversation by an individual "doing an apparent sales solicitation on the phone." Tr. at 417. George stated that "This individual seemed to be conducting some sort of phone solicitation ..." *Id.* George's testimony continued:

Q. Who was this individual who was doing this phone solicitation at the Grigg Street location?

A. The individual was a Mr. Michael Gent and he was solicitating under the name of AVCO Financial.

Q. What sorts of key words was he using on the phone?

A. The portion that I remember, I did remember him using "results." I can't remember specific words other than that. The overall tone of the conversation seemed to be a solicitation in progress. That was five years ago. I can't remember specific words, but I know at the time we did take notice of it, and if I didn't think it was a solicitation in progress I probably would have just ignored it.

Tr. at 417–28. This incident resulted in George's writing a memo to the CFTC proposing an investigation of Dr. Gent. *See* Tr. at 418–19. While recognizing the proper concern of government agencies that members of the public should not be defrauded, the Court still does not think that these two instances amount to solicitation by Gent.

### Conclusions of Law

■ In an enforcement action of this type where the Commission seeks permanent injunctions of future violations, disgorgement, restitution, recision, and civil monetary penalties, the appropriate standard of proof is preponderance of the evidence. *See SEC v. Moran,* 922 F.Supp. 867, 887–90 (S.D.N.Y. 1996). The convincing reasons set forth by Judge Newman in *Moran* as to the burden faced by the SEC in securities litigation apply here to the Commission.

### A. Count I, Solicitation Fraud

■ Count I of the Complaint charges each of the Defendants with violating 7 U.S.C. § 6b(a)(i). Section 6b(a)(i) makes it unlawful for any person (i) to cheat or defraud, or to attempt to cheat or defraud, any other person (ii) in connection with the making of a contract for the sale of any commodity for future delivery for or on behalf of any other person. *See Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 109 (2d Cir.1986). To establish the fraud element of a § 6b(a)(i) charge, it must be established that Defendants made a material misrepresentation with scienter. "[A] statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Id.* at 111.

■ The Court concludes that AVCO's representations that Recurrence generated large profits, overwhelmingly picked winning trades, and involved little or no risk of loss, and that all of these claims were based on results obtained in actual trading, constituted information that a reasonable potential investor would consider important in the decision first, to purchase the Recurrence system and, second, to rely on the recommendations

of the Recurrence system in making trades in the futures markets. *See id.* at 112. Accordingly, these representations were material. The Court further concludes that these representations as to profitability and risk were false and misleading and these representations were made with scienter.

The evidence at trial regarding the substantial losses suffered by customers using the Recurrence system demonstrated that following Recurrence's recommendations was not a low-risk, high-profit venture. These claims of extraordinary profitability and low risk were false. Additionally, the representations that Recurrence's performance history was based on actual trading were false and fraudulent. *See CFTC v. Skorupskas,* 605 F.Supp. 923, 933 (E.D.Mich.1985) (holding that "the failure to disclose information that a performance record does not represent the results of actual trading but of hypothetical or fictitious trading" was fraudulent). While the defense argues that it never claimed that the results were based on actual trading and that customers had notice that the results were based on simulated trading, the Court concludes that the language used in the advertisements and promotional materials clearly indicated to the reasonable potential investor that Recurrence's performance history was based on actual trading and that this was the intended effect. The Court bases this conclusion on the fact that there was no indication in the ads or promotional materials that these results were based on simulated trading other than on the Recurrence order form, which was on a separate page in the promotional materials and not included in the advertisements. The order form's purported disclaimer as to hypothetical trading results was placed and phrased in such a way as to cause consumers as to believe that this "disclaimer" did not apply to Recurrence but was merely required to be included in the materials by law. Indeed, Vartuli admitted on cross-examination that a reasonable investor reading the advertisements would believe that Recurrence's history of recommending profitable trades was based on actual trading rather than simulated hypothetical trading. *See* Tr. at 597.

■ With regard to the scienter requirement, the fact that Vartuli knew that the advertisements for Recurrence would lead potential customers to believe the extraordinary profit performance results were based on actual trading, rather than simulated trading, meets the scienter requirement. Claims that Recurrence's performance results were based on real trading, as well as the predictions and boasts regarding Recurrence's profitability based on its past trading performance, deliberately blurred the distinction between real and hypothetical trading results. These representations were meant to cause customers to believe that Recurrence's results were based on actual money and actual trades, and that therefore customers should rely on Recurrence's trading advice. These claims were made intentionally and with knowledge of their fraudulent and misleading nature. *See* Tr. at 597. Moreover, the evidence showed that Defendants AVCO and Vartuli continued to make claims of Recurrence's profitability, accuracy and minimal risk even after customers informed them that Recurrence was unprofitable, inaccurate and risked nearly certain loss. The Court concludes that these continued misrepresentations were made intentionally and with knowledge of their falsity and/or tendency to mislead. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (holding that the term scienter refers to a mental state embracing an intent to deceive, manipulate or defraud).

■ The Court further concludes that the misrepresentations were made "in connection with" futures trading. In *Saxe,* the Second Circuit pointed out that misrepresentations concerning the profitability and risks of a trading system, as well as the performance history of accounts traded pursuant to that system, were "in connection with" the purchase or sale of commodity futures contracts. 789 F.2d at 110–11; *see also Skorupskas,* 605 F.Supp. at 933 (holding that "the failure to disclose information that a performance record does not represent the results of actual trading by of hypothetical or fictitious trading" violates § 6b). Defendant AVCO's and Vartuli's misrepresentations dealt with the high profitability and minimal risk associated with following the Recurrence program's

trading advice. Thousands of futures contracts were traded pursuant to that advice, and therefore AVCO's and Vartuli's misrepresentations meet the "in connection with requirement."

Accordingly, insofar as the evidence demonstrates that AVCO and Vartuli made fraudulent misrepresentations in connection with the sale of futures contracts, both of these defendants are directly liable under 7 U.S.C. § 6b(a)(i). As for Defendant Gent, the Court concludes that the Commission has not established by a preponderance of the evidence that he made any fraudulent misrepresentations in connection with the sale of futures contracts.

### 1. Controlling Person Liability

Defendants Vartuli and Gent are also charged with liability for AVCO's violations of § 6b(a)(i) as controlling persons, pursuant to 7 U.S.C. § 13c(b). Section 13c(b) provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter, .... may be liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission shall have the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b). The Second Circuit has stated that the issue of control is a determination based upon the totality of the circumstances, including an appraisal of the influence upon management and policies of a corporation by the alleged control person. *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir.1976).

▇ Vartuli has acknowledged being a controlling person of AVCO, *see* Answer ¶ 48; Defendants' Proposed Findings ¶ 52, and, as the Court found above, the evidence established that he controlled AVCO. However, Vartuli maintains that the Commission has not shown that he "acted in bad faith." The Court concludes that Vartuli's "bad faith" was adequately demonstrated by the deceptive ads that he authored and approved, his misrepresentations to customers as discussed above, and the fact that he continued to make claims about Recurrence's high profitability and minimal risk despite knowing of problems with the program and losses suffered by customers who relied on the program's advice.

Gent maintains that he was not a controlling person of AVCO. The Commission urges that "Gent's behavior, lack of employment contract and compensation arrangements were more consistent, however, with being a partner than an employee" and thus "he was a *de facto* partner" and a controlling person. Pl.'s Proposed Findings ¶ 32. As discussed in the findings of fact, the Court concludes that Gent was not a controlling person. Vartuli was the whole show and called all the shots. The Court was impressed with Gent's candor, demeanor and frankness on the witness stand. He did research for and was a technical support employee of AVCO, not a controlling person. The fact that he did not have control over his salary, how AVCO's money was spent, *see, e.g.,* Tr. at 301–03, or control over solicitation and marketing of Recurrence supports this conclusion.

### 2. Aiding and Abetting

▇ Count I additionally charges Vartuli and Gent with aiding and abetting AVCO's violations of § 6b(a)(i), pursuant to 7 U.S.C. § 13c(a). Section 13c(a) provides,

> Any person who commits, or who willfully aids [or] abets ... a violation of any of the provisions of this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter ... may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a). The Commission has interpreted this "aiding and abetting" provision to require proof that the alleged aider and abettor "knowingly associate[d] himself with an unlawful venture, participate[d] in it as something that he wishes to bring about and seek by his actions to make it succeed." *In*

*re Commodities Int'l Corp.*, [Current Transfer Binder] Comm. Fut. L. Rep. ¶ 26,943 at 44,564, 1997 WL 11543, at *10, (CFTC Jan. 14, 1997) (quoting *In re Richardson Securities, Inc.*, [1980–1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,145 at 24,643 (CFTC Jan. 27, 1981)). By drafting and approving the fraudulent representations in the Recurrence advertisements, supervising the placement of these advertisements, and making misrepresentations to potential customers, Vartuli knowingly associated himself with an unlawful venture and worked to make it successful. Vartuli is therefore liable for AVCO's § 6b(a)(i) violations as an aider and abettor, pursuant to § 13c(a). As for Defendant Gent, the Court finds that he was merely an AVCO employee, who conducted research and helped to develop the Recurrence software program, and not a real participant in the fraudulent goings-on. The evidence just does not establish that he knowingly associated himself with an unlawful venture.

## B. Count II, Fraud by a CTA

Count II charges AVCO with violating 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41(a)-(b) of the Regulations. Count II charges Vartuli and Gent with liability for AVCO's violations of § 6o(1) and Regulation § 4.41(a)-(b) as controlling persons and as aiders and abettors.

Section 6o(1) of the U.S.C. and § 4.41(a) of the Regulations prohibits a CTA from employing any device, scheme, or artifice to defraud any client or prospective client, or from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. Regulation § 4.41(b) prohibits CTAs from presenting hypothetical performance statistics as to futures trading unless those

statistics are accompanied by the specific warning set forth in § 4.41(b)(1)(i),[2] which makes clear that hypothetical or simulated performance results have certain limitations and are not the results of actual trading.

### 1. Whether AVCO is a CTA

A person is a CTA if that person: (1) advised others about the value or the advisability of trading in commodity futures contracts, (2) "either directly or through publications, writings or electronic media," (3) for compensation or profit, (4) unless that person is "the publisher or producer of any print or electronic data of general or regular dissemination," if such publisher's or producer's provision of commodity futures trading advice is "solely incidental to the conduct of [its] business or profession." 7 U.S.C. § 1a(5)(A)-(C).

■■■■ The Court concludes that AVCO was a CTA. AVCO provided its customers with advice on trading Swiss franc futures contracts, and later Japanese yen, through the electronic medium of the Recurrence software. Throughout the day, in response to market conditions, Recurrence provided specific buy, sell, stop and profit objective recommendations to customers. AVCO also provided trading advice to customers over the telephone in conjunction with the Recurrence software. As indicated above, Vartuli told some customers that no trades should be made during the month of December despite the fact that the Recurrence program would signal a trade, Vartuli also advised some customers not to trade on days following a day during which the Swiss franc market had traded within various ranges, and Vartuli answered customers' questions when they called to confirm whether the recommendations generated by Recurrence should be fol-

---

2. Regulation § 4.41(b)(1)(i) provides:
 (b)(1) No person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a commodity pool operator, commodity trading advisor, or any principal thereof, unless such performance is accompanied by one of the following:
 (i) The following statement: "Hypothetical or simulated performance results have certain inherent limitations. Unlike an actual performance record, simulated results do not represent actual trading. Also, since the trades have not actually been executed, the results may have under- or over-compensated for the impact, if any, of certain market factors, such as lack of liquidity. Simulated trading programs in general are also subject to the fact that they are designed with the benefit of hindsight. No representation is being made that any account will or is likely to achieve profits or losses similar to those shown[.]"

lowed. AVCO received compensation for the trading advice in the form of the customers' payments for the Recurrence program. Moreover, AVCO's business was to provide commodity futures trading advice and, therefore, AVCO's provision of trading advice was not solely incidental to its business.

The defense relies on *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), to advance its position that AVCO is not a CTA because AVCO provided nonpersonalized investment advice. Such reliance is misplaced, as this Court ruled in the September 29, 1997 decision denying Defendants' motion to dismiss the Complaint and rejecting the same arguments Defendants make here. *See CFTC v. Avco Fin., Corp.*, 979 F.Supp. at 236–37. First, in *Lowe* the Supreme Court interpreted a statutory exclusion to the definition of an "investment advisor" under the Investment Advisers Act that was broader than the statutory exclusion to the definition of a CTA under the CEA. The definition of a CTA, pursuant to the CEA, excludes "the publisher or producer of any print or electronic data of general or regular dissemination ... *only if the furnishing of such [investment advice] services ... is solely incidental to the conduct of their business or profession.*" 7 U.S.C. § 1a(5)(B)-(C) (emphasis added). In this case, AVCO's business was the supplying of commodity trading advice under the Recurrence programs; thus, the sale of Recurrence was AVCO's business and not incidental thereto. Second, as this Court indicated in the September 29, 1997 decision, even assuming *Lowe* applies here, the evidence at trial demonstrated that AVCO provided personalized investment advice to its customers that was characteristic of investment adviser-client relationships and therefore the result does not change. *See CFTC*, 979 F.Supp. at 237. Unlike a generally disseminated newsletter which provides nonpersonal investment advice, the evidence demonstrated the following: (1) AVCO's investment advice is communicated to customers on an irregular basis in response to certain market conditions, (2) the Recurrence program gives the customer specific buy, sell, stop and profit recommendations, (3) the program monitors the customers' position throughout the trading day and provides spe-

cific additional instructions as the market changes for the customer to immediately follow, (4) customers telephoned AVCO employees for advice as to the Recurrence recommendations and whether the signals should be followed and, in response, AVCO employees gave these customers trading advice, and (5) AVCO provided a service to customers by which brokers authorized by AVCO made trades pursuant to Recurrence's directions for customers who could not monitor the system during trading hours. Consequently, the Court concludes that AVCO's investment advice constituted personalized investment advice and, therefore, the Court need not address Defendants' First Amendment arguments.

### 2. Whether AVCO committed fraud

■ Insofar as the Court has found that AVCO made false and misleading representations to customers regarding the past profitability and track record of Recurrence in an effort to induce customers to purchase the program and follow Recurrence's recommendations, the Court concludes that AVCO employed "devices, schemes or artifices to defraud" and "practices or courses of business which operate as a fraud or deceit upon" its customers in violation of 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41(a). *See Skorupskas*, 605 F.Supp. at 933 (holding that "the failure to disclose information that a performance record does not represent the results of actual trading but of hypothetical or fictitious trading" is a violation § 6o(1)).

■ In addition, because the hypothetical performance statistics used in AVCO's Recurrence advertisements were not accompanied by the warning required by 17 C.F.R. § 4.41(b), AVCO has violated § 4.41(b). As for the hypothetical performance statistics recited in Recurrence's promotional materials, the Court finds that the order form warning included in the promotional materials did not meet the requirements of § 4.41(b). This warning was placed on a separate page from the rest of the materials containing the misrepresentations at issue and the warning was phrased in such a manner as to be misleading to the reasonable potential customer, causing him or her to

**120**

believe that the warning did not apply to AVCO's statements regarding Recurrence's performance results. These order form warnings were not prominently disclosed as required by § 4.41(b)(2). Accordingly, AVCO violated § 4.41(b) of the Regulations.

Vartuli is liable for AVCO's 7 U.S.C. § 6*o*(1) violations and AVCO's violations of § 4.41(a)-(b) of the Regulations as a controlling person and an aider and abettor. Vartuli was responsible for the content of these advertisements and knew that they misled potential customers. However, the Court finds that the evidence does not support a finding of liability for Gent as a controlling person or as an aider or abettor. The Court finds that Gent had no role in these violations and the evidence does not support a finding that he acted in bad faith or knowingly associated himself with AVCO's unlawful activities.

### C. Count III, Acting as a CTA without Registering with the Commission

Count III charges AVCO with violating 7 U.S.C. § 6m(1), which prohibits "any commodity trading advisor . . ., unless registered [with the Commission], to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor . . . ." Count III also charges Vartuli and Gent with liability for AVCO's violation of § 6m(1) as controlling persons and as aiders and abettors.

 The Court has concluded that AVCO was a CTA, and there is no dispute that AVCO was not registered with the Commission. The evidence demonstrated that AVCO used the mails and other instrumentalities of interstate commerce, such as telephones, faxes and overnight mail delivery services, in connection with its business as a CTA. *See, e.g.*, Tr. at 48–50, 57–59, 190, 237, 386–89; Love Dep. at 52–55. Consequently, AVCO has violated § 6m(1). The evidence further supports the conclusion that Vartuli is liable for AVCO's § 6m(1) violation as a controlling person, as well as an aider and abettor. Vartuli ran the show at AVCO. However, the Court finds that the evidence does not support a finding that Gent is liable

for the § 6m(1) violations as either a controlling person or as an aider and abettor. As the Court has found, Gent was not a controlling person of AVCO. The evidence does not support a finding that he acted in bad faith, knew that AVCO was not registered with the Commission or knew that AVCO should have been registered, or that he knowingly associated himself with an unlawful venture.

### D. Relief

In terms of a remedy, the Commission seeks a permanent injunction enjoining the culpable defendants from committing further violations of the CEA sections charged in this Complaint. The Commission also seeks ancillary relief in the form of disgorgement, restitution, rescission and civil monetary penalties.

#### 1. Permanent Injunctive Relief

 A permanent injunction "is appropriate where there is a likelihood that unless enjoined the violations will continue." *CFTC v. American Bd. of Trade, Inc.*, 803 F.2d 1242, 1250–51 (2d Cir.1986). A district court may infer a likelihood of future violations from the defendant's past unlawful activity. *See id.* at 1251. As for Vartuli, upon consideration of (1) his central role in the three violations by AVCO in this case, (2) the fact that customers lost thousands of dollars on the Recurrence system due to falsehoods and misrepresentations that he masterminded and perpetuated over several years, (3) that Vartuli continued to make these misrepresentations even after receiving complaints by customers that refuted the accuracy of his claims, (4) that Vartuli and AVCO have contended throughout this litigation that AVCO is not a CTA subject to the CEA, and (5) the fact that Vartuli's present position at AFX involves currency trading, the Court concludes that permanent injunctive relief enjoining Vartuli from future violations of the CEA as charged in this case is warranted. As for AVCO, the same reasoning supports the issuance of an injunction. Despite the fact that AVCO is in bankruptcy, there is no indication that AVCO will cease its business of providing trading advice. Moreover, Vartuli remains the president and sole share-

holder of AVCO. The Commission shall submit a proposed injunction with a copy to Vartuli's counsel by July 6, 1998.

### 2. Disgorgement, Restitution and Rescission

 In cases such as this, district courts have "broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir.1996), *cert. denied* — U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *see American Bd. of Trade*, 803 F.2d at 1252; *CFTC v. Hunt*, 591 F.2d 1211, 1222–23 (7th Cir.1979). The disgorgement remedy is not intended to compensate investors; rather, it is intended to deprive the violator of his ill-gotten gains and to further the deterrence objectives of the CEA. *See American Bd. of Trade*, 803 F.2d at 1252; *SEC v. Drexel Burnham Lambert, Inc.*, 956 F.Supp. 503, 507 (S.D.N.Y.1997). Restitution is meant to make the damaged persons whole and compensate them for a defendant's wrongful acts. *See Drexel Burnham Lambert*, 956 F.Supp. at 507.

 Insofar as (1) AVCO received $4,148,572 in sales revenue from Recurrence customers, (2) AVCO violated provisions of the CEA in marketing the Recurrence program and in soliciting customers to purchase the program, (3) customers purchased Recurrence based upon AVCO's misrepresentations as to the high profitability and minimal risk associated with trading according to Recurrence, and (4) Vartuli was a controlling person of AVCO who played a central role AVCO's unlawful activities and, particularly, in authoring and disseminating the misrepresentations that customers relied upon, the Court concludes that Defendants AVCO and Vartuli are jointly and severally liable for disgorgement in the amount of $4,148,572. *See First Jersey Sec., Inc.*, 101 F.3d at 1475–76 (liability for disgorgement among multiple defendants is properly joint and several where they acted collectively and had a close relationship). The disgorgement in this case is meant to deprive these Defendants of their ill-gotten gains, as well as to generally deter others from similar CEA violations. Insofar

as the CFTC's post-trial submission did not address the issue of the supervision and appropriate disbursement of the disgorged monies, the Court directs the Commission to provide the Court with a submission on this issue by July 13, 1998. The submission is to address (1) the options available to the Court on the disgorgement issue, citing appropriate caselaw, and (2) the Commission's preferred option.

 In addition to a permanent injunction and disgorgement, the CFTC seeks an order awarding restitution to AVCO's customers for trading losses they suffered by trading in accordance with Recurrence's recommendations. The Court declines to exercise its equitable powers by ordering restitution in addition to disgorgement and civil monetary penalties in this enforcement action. The Court believes that disgorgement and the civil monetary penalties adequately serve the objectives of this enforcement action. Moreover, the Court concludes that the record is incomplete as to the total trading losses suffered by each of AVCO's Recurrence customers, *see* Pl.'s Proposed Findings ¶ 17, and the Court declines to arbitrarily choose a restitution amount based only on examples of trading losses suffered by some customers and brokers.

 As for the CFTC's application for an order rescinding the contracts between AVCO and each of its customers, the Court denies that application as to this enforcement action by the Commission. The Court believes that this remedy is appropriately pursued by private civil suits instituted by each of AVCO's customers interested in such relief.

### 3. Civil Monetary Penalty

 Section § 13a–1(d)(1) provides for fines of not more than the higher of $100,000 or three times the monetary gain to the person for each violation. *See* 7 U.S.C. § 13a–1(d)(1). In fixing any civil monetary penalty, courts should be realistic and not set a figure which is impossible for a defendant to comply with due to lack of monetary resources. Accordingly, the Court finds that

**122**

an award of $5,000 against AVCO and $5,000 against Vartuli is appropriate in this case.

### Conclusion

Judgment shall be entered against AVCO and Vartuli in accordance with these Findings of Fact and Conclusions of Law. The Complaint is ordered dismissed as to Gent. The Commission is to provide the Court with the submission on the disgorgement issue by July 13, 1998.

**SO ORDERED**.