COMMODITY TREND SERVICE,
INC., Plaintiff–Appellant,

v.

COMMODITY FUTURES TRADING
COMMISSION, Defendant–
Appellee.

No. 97–3477.

United States Court of Appeals,
Seventh Circuit.

Argued May 22, 1998.

Decided July 17, 1998.

William J. Nissen (argued), Sidley & Austin, Chicago, IL, for Plaintiff–Appellant.

William S. Liebman (argued), Daniel Waldman, Commodity Futures Trading Commission, Office of the General Counsel, Washington, DC, Dennis M. Robb, Commodity Futures Trading Commission, Chicago, IL, for Defendant–Appellee.

Lee Levine, Thomas Howlett, Levine, Pierson, Sullivan & Koch, LLP, Washington, DC, for Amicus Curiae.

Before FLAUM, RIPPLE, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Commodity trading advisors are required to register with the Commodity Futures Trading Commission ("CFTC" or "the Commission") pursuant to 7 U.S.C. § 6m(1)—a provision of the Commodity Exchange Act. This requirement probably would not have drawn objection if it was limited to purveyors of personalized, client-specific trading advice. The language of the registration requirement is not so narrow, however, and the Commission has determined that the requirement also applies to those who dispense impersonal information regarding the performance or value of a particular commodity. Commodity Trend Service, Incorporated ("CTS"), according to its amended complaint, publishes this sort of impersonal investment advice, and it attacks the registration requirement as a violation of the First Amendment. The district court dismissed this suit as unripe for judicial review without reaching the merits of CTS's challenge. We reverse the decision of the district court and remand the case for further proceedings.

## I.

Congress created the CFTC in 1974 to implement the Commodity Exchange Act's comprehensive regulation of the "volatile and esoteric futures trading complex." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 836, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (quotation omitted). As part of that regulatory structure, the Act prohibits any commodity trading advisor or commodity pool operator, "unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator." 7 U.S.C. § 6m(1). The scope of this registration requirement is determined by 7 U.S.C. § 1a(5)(A), which defines the term "commodity trading advisor" as any person who

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

(II) any commodity option authorized by section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

The broad sweep of this definition is tempered somewhat by the exclusion of certain persons, *see* 7 U.S.C. § 1a(5)(B) (excluding, for instance, a publisher or producer of any print or electronic data), but the force of those exclusions is enervated significantly by the very next provision: "Subparagraph (B) *shall apply only if the furnishing of such services by persons referred to in subparagraph (B) is solely incidental to the conduct of their business or profession.*" 7 U.S.C.

§ 1a(5)(C). Violation of the registration requirement is "a felony punishable by a fine of not more than $1,000,000 (or $500,000 in the case of a person who is an individual) or imprisonment for not more than five years, or both, together with the costs of prosecution." 7 U.S.C. § 13(a); *see also* 7 U.S.C. § 13(a)(5).

CTS claims that the registration requirement allows the Commission unfettered power to inhibit the First Amendment freedoms of financial publishers. To avoid a criminal violation, financial publishers must first obtain and then *maintain* their licenses as registered commodity trading advisors. The CFTC has enormous power to refuse a publisher's request for a license and to revoke a license once issued. The Commission is authorized by 7 U.S.C. § 12a(3)(A) to refuse registration or to revoke the license of a person or entity who is found to have violated any provision of the Commodity Exchange Act (including the registration requirement). The CFTC may also refuse to register or may revoke a license if "there is other good cause," 7 U.S.C. § 12a(3)(M). The Commodity Exchange Act does not provide a definition of "good cause."

According to its amended complaint, CTS distributes a number of publications concerning the commodity futures markets. These publications come in the form of books, periodicals, updates by facsimile, voice recordings accessible by telephone, and materials that can be downloaded via the Internet. The content of CTS's publications-again, according to its amended complaint—includes "securities and commodities market charts, market commentary, and educational publications concerning markets and trading." All of these publications furnish only impersonal advice; CTS does not provide personalized financial planning services or trading advice tailored to the individual needs of any particular subscribers.

CTS and its predecessor corporation have engaged in the business of financial publishing for over twenty years. The CFTC and the registration requirement both existed during this time, but until recently there never was any attempt to regulate CTS's activities (or those of other similar publishers). In the mid–1990s, however, the CFTC announced a shift in its enforcement policy and embarked upon a new program to register financial publishers. As part of this new effort, in 1994 the CFTC requested access to CTS's records for the purpose of determining whether CTS should be required to register as a commodity trading advisor. CTS responded that it was not required to register, and the matter lay dormant for nearly two years.

In July 1996, however, the CFTC launched an investigation into CTS's activities. In the course of this investigation (so far), the CFTC has subpoenaed thousands of documents—including samples of CTS's publications and advertising—and has taken testimony from numerous employees and other persons concerning CTS's publishing activities. CTS alleges that the exercise of its First Amendment rights has been chilled by this investigation and by the statutory registration requirement itself. CTS states that it has been forced to alter "significant portions of the editorial content of its publications"; in addition, CTS has suspended its direct-mail advertising, halted the development of new publications relating to the commodity markets, and diluted the specificity of its commodity market commentary. The CFTC's investigation has caused one of CTS's columnists to cease writing for its publications based on a fear of government reprisal. CTS also alleges that the chilling effect has made its commodity-related publications less attractive to consumers, thereby causing a decline in its revenues. Aside from these past and present injuries, CTS states that it wishes to expand its publication of impersonal commodity advice in the future without registering with the CFTC but is deterred by the registration requirement.

CTS's amended complaint attacks the Commodity Exchange Act's registration requirement in two ways. The amended complaint first pleads that 7 U.S.C. § 6m(1) is unconstitutional on its face, and second, that § 6m(1) may not constitutionally be applied to CTS. The district court *sua sponte* requested additional briefing on the question of CTS's standing to raise these challenges. After receiving this briefing, the court dis-

missed both counts of CTS's amended complaint as unripe. CTS filed a motion to reconsider this judgment, but the district court denied that motion.

## II.

We address CTS's claims in the same order in which they are presented in the amended complaint. We proceed mindful of the Supreme Court's strong admonition that a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute. *See Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 484–86, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). For instance, if CTS succeeds on its as-applied challenge, the district court should not conduct further proceedings concerning the facial challenge. See *infra* note 5. This approach establishes the order in which the district court should assess the *merits* of CTS's two claims, but it does not mandate any particular order to our review of the district court's justiciability determinations. At this stage of the proceedings, we must address both of the justiciability issues on appeal—thus rendering irrelevant the order in which we address the claims—whereas, on remand, the district court should resolve the merits pursuant to the Supreme Court's prescribed methodology. We therefore address each of CTS's arguments in the order they are presented in the amended complaint.

CTS first raises a facial challenge to the Commodity Exchange Act's registration requirement. CTS claims that the requirement is unconstitutionally overbroad because it sweeps within its coverage publishers of impersonal advice. *See* 7 U.S.C. § 1a(5)(A)(i) & (ii) (defining a "commodity trading advisor" as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in" commodity options or any such person who "issues or promulgates analyses or reports" concerning commodity options). CTS contends that impersonal advice and commentary concerning commodity trading constitute protected expression under the First Amendment. *See Lowe v. Securities & Exch. Comm'n,* 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (holding that Congress could not have intended to include publishers of impersonal investment advice within the definition of "investment adviser" under the Investment Advisers Act of 1940 because doing so would have violated the First Amendment); *see also id.* at 211, 236, 105 S.Ct. 2557 (White, J., concurring in judgment) (stating, along with two other Justices, that the Investment Advisers Act of 1940 *did* require publishers of impersonal investment advice to register with the S.E.C. and, for that reason, was unconstitutional). We conclude that CTS has met the justiciability requirements for this facial challenge: It "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

█ The district court nonetheless dismissed CTS's facial challenge as unripe because it found that the expression chilled by the registration requirement was "concededly" commercial speech. The court correctly noted that, as an abstract matter, plaintiffs may not bring facial overbreadth challenges to redress allegedly unconstitutional restrictions on commercial speech. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496–97, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *United States v. Walton,* 36 F.3d 32, 35–36 (7th Cir.1994). Therefore, the district court stated that CTS's commercial-speech concession effectively transformed its facial challenge into an as-applied challenge—the only kind available for infringements of commercial speech. The court then held that the as-applied challenge was not ripe for review.

CTS's purported concession, however, is nowhere to be found in the record. Indeed, CTS filed a motion for reconsideration strenuously controverting this faulty premise of the district court's opinion. This error, though, was not addressed in the district court's subsequent ruling and was further compounded by the district court's reliance

on newly-introduced evidence that supposedly established the commercial nature of CTS's speech. *See Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986) (stating that "a motion for reconsideration is an improper vehicle to introduce evidence previously available or to tender new legal theories"); *see also Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir.1996). In its response to the motion for reconsideration, the CFTC submitted examples of CTS's advertisements of its publications in support of the district court's decision to treat this as a commercial speech case. In denying the motion to reconsider, the district court appears to have concluded both that the publications described in the advertisements were commercial speech and that the advertisements themselves were commercial speech.

▇ We believe that the district court erroneously determined that CTS's publications—as reflected in the current state of the record—fit within the Supreme Court's definition of commercial speech. The Court has candidly recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).[1] The traditional, narrow definition of commercial speech is "speech which does no more than propose a commercial transaction." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 340, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (quoting *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). Commercial advertising constitutes paradigmatic commercial speech under the Supreme Court's standard because its fundamental purpose is to propose an economic transaction. *See, e.g., 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496–500, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Ibanez v. Florida Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994); *Bol-ger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). A long line of Supreme Court cases, however, confirms that speech does not become "commercial" simply because it concerns economic subjects or is sold for a profit. *See, e.g., Fox*, 492 U.S. at 482, 109 S.Ct. 3028; *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n. 5, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Burstyn v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

▇ The Supreme Court offered an additional, broader definition of commercial speech in *Central Hudson*. That new test stated that commercial speech was "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561, 100 S.Ct. 2343; *see also Discovery Network, Inc.*, 507 U.S. at 422, 113 S.Ct. 1505 (noting that the *Central Hudson* standard identified a "somewhat larger category of commercial speech"). It was not clear in *Central Hudson* how, if at all, this newly-enunciated standard differed from the traditional definition because *Central Hudson* dealt with promotional advertising by an electrical utility—paradigmatic commercial speech under the traditional test. Moreover, in subsequent cases, the Court has not offered any nuanced distinctions between the two standards, and the Court noted in *Discovery Network* that it had not utilized the broader test in its recent commercial speech cases. *See* 507 U.S. at 422, 113 S.Ct. 1505. It is not for us to proclaim the official demise of the *Central Hudson* test. *See State Oil Co. v. Khan*, —— U.S. ——, ——, 118 S.Ct. 275, 284, 139 L.Ed.2d 199 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."). Yet, because *Central Hudson* dealt with commercial advertising (the most basic sort of commercial speech), and given the incredible breadth of the *Central Hudson* test if taken to its literal extremes,

---

1. Indeed, many scholars argue that this difficulty, among other reasons, counsels against a separate classification and concomitant lower level of First Amendment protection for commercial speech. *See, e.g.,* Martin H. Redish & Howard M. Wasserman, *What's Good for General Motors: Corporate Speech and the Theory of Free Expression*, 66 Geo. Wash. L.Rev. 235 (1998).

we will not rush to endow that standard with a greater scope than the traditional definition.

In light of these considerations, we cannot say on the present record that CTS's publications constitute commercial speech. The district court seemed to conclude that the *advertising* for those publications was commercial speech, but this is largely irrelevant to the inquiry at hand. The proper subject of analysis is CTS's publications themselves; the advertisements are relevant only to the extent that they shed light on the content of these underlying publications. A speaker's publication does not lose its status as protected speech simply because the speaker advertises the publication. An advertisement is a separate publication and does not strip the promoted publication of its First Amendment protection. *See Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 760–61, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). If the result were otherwise, then even an editorial in *The New York Times* would constitute commercial speech because the newspaper seeks subscribers through advertisements.

We must look, then, to the content of CTS's publications themselves. The record, though, contains a gaping hole because CTS has yet to enter any of its publications into the record. The amended complaint states only that the publications "include securities and commodity market charts, market commentary, and educational publications concerning markets and trading." The amended complaint goes on to aver that CTS provides only impersonal advice and information. CTS believed that the district court was required to give a liberal construction to the amended complaint's descriptions of the publications. *See, e.g., United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir.1996) (stating that a court should accept well-pleaded allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor when ruling on a motion to dismiss). CTS argued, in essence, that its publications were not commercial speech simply because it alleged as much in the amended complaint.

The district court exhibited some understandable frustration at CTS's unwillingness to simplify this threshold inquiry by submitting examples of its publications. The protected status of CTS's publications was a jurisdictional issue in light of the prohibition of facial challenges for infringements of commercial speech. On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the court is not bound to accept the truth of the allegations in the complaint. Rather, the plaintiff has the obligation to establish jurisdiction by competent proof, and the court may properly look to evidence beyond the pleadings in this inquiry. *See, e.g., Calderon v. United States*, 123 F.3d 947, 951 n. 2 (7th Cir.1997) (stating that courts "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists") (quotation omitted); *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir.1980) ("Where the defendant raises factual questions concerning jurisdiction, the court need not accept the allegations of the complaint as true; the court may look behind the complaint and view the evidence to determine whether a controversy in fact exists."). The presumption of correctness that we accord to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question. At that point, a court need not close its eyes to demonstrated jurisdictional deficiencies in a plaintiff's case and accord a plaintiff's unproven allegations greater weight than substantive evidence to the contrary. Viewing the sparse record before us (and in light of the simple solution to the problem), we certainly sympathize with the district court's exasperation at CTS's litigation strategy.

Nevertheless, we must disagree with the court's conclusion that the thin record proves CTS's publications to be commercial speech. The publications advertised in the exhibits submitted by the CFTC do not appear to propose commercial transactions between CTS and any customers. Rather, they appear to provide information on commodity

trading in general and leave any actual trading to other parties. For instance, the advertisements describe publications such as "Monthly Chart Supplements," which give the historical price ranges for various markets and a long-term perspective that can be helpful when evaluating trading options. A telephone hotline operated by CTS offers "hot picks" (impersonal trading recommendations and market commentaries) and general instructions on how to "trade like a pro in just 5 minutes a day." Other publications discuss methods of reducing trading risk, spotting undervalued options, and extrapolating useful information from long-term market trends. The advertisements abound with glowing testimonials from satisfied customers celebrating the wealth of helpful market information provided by CTS's publications.

The advertised publications, as we have emphasized, are not commercial speech because they do not propose a commercial transaction between CTS and a specific customer. *See, e.g., Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). They seem instead more closely analogous to a restaurant or performance review, or a *Consumer Reports* article, in the context of the commodity markets. CTS's publications appear to provide impersonal evaluations and recommendations regarding available trading options. Just like a restaurant review does not propose a transaction between the individual reader and the restaurant, the publications themselves do not propose any commodity transaction. Courts have held that such impersonal information is not commercial speech. *See, e.g., Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (affording full First Amendment protection to a *Consumer Reports* evaluation of a loudspeaker); *Security & Exch. Comm'n v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 372 (D.C.Cir.1988) (holding that there is no "clear fit between the commercial speech doctrine and the publications that the SEC here seeks to regulate" where the challenged publications printed stories of "general financial interest" and profiles of specific invest-

ment prospects), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); *Gordon & Breach Science Pubs. S.A., STBS, Ltd. v. American Inst. of Physics*, 859 F.Supp. 1521, 1544 (S.D.N.Y.1994) (stating that a restaurant review or *Consumer Reports* product report would not be commercial speech); *In re Scott Paper Co. Sec. Litig.*, 145 F.R.D. 366, 369 (E.D.Pa.1992) (allowing Standard & Poor's to assert journalist's privilege relating to creditworthiness report and stating that "[w]e see no reason why disseminators of corporate financial information should not have as strong a claim to First Amendment protection as do disseminators of other kinds of information"). Indeed, the Supreme Court has commented specifically that the First Amendment affords full protection to impersonal investment advice. *See Lowe v. Securities & Exch. Comm'n*, 472 U.S. 181, 210, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) ("To the extent that the chart service contains factual information about past transactions and market trends, and the newsletters contain commentary on general market conditions, there can be no doubt about the protected character of the communications . . . ."); *see also id.* at 210 n. 58, 105 S.Ct. 2557 ("Moreover, because we have squarely held that the expression of opinion about a commercial product such as a loudspeaker is protected by the First Amendment [citing *Bose*], it is difficult to see why the expression of an opinion about a marketable security should not also be protected."). Our independent review of the record, in conjunction with the foregoing legal authority, convinces us that we must reverse the district court's current determination that CTS's publications constitute commercial speech.[2]

■■■■■■ In addition to clearing the "commercial speech" hurdle to jurisdiction, CTS's facial challenge presents a justiciable case or controversy under Article III of the Constitution. The Supreme Court established a two-part test for assessing the justiciability of First Amendment facial overbreadth challenges to criminal statutes in *Babbitt v. Unit-*

---

**2.** Our conclusion is based on the less-than-ideal record presently before us. On remand, the dis-

trict court may find reason to re-evaluate our decision based on additional factual evidence.

*ed Farm Workers Nat'l Union,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). A plaintiff establishes a ripe, justiciable challenge when it alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 298, 99 S.Ct. 2301.[3] It is not necessary, under this test, that a plaintiff expose itself to actual arrest or prosecution. *See id.* (citing *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)). The plaintiff has a duty, though, to demonstrate that the threat of prosecution is more than speculative. *Cf. Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (holding that plaintiffs fail to allege a justiciable controversy if they "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible").

 CTS has satisfied the *Babbitt* test for justiciability in this case. The amended complaint alleges an intention to increase the publication of impersonal commodity trading advice to a level above that which is "solely incidental" to the conduct of CTS's business. Thus, CTS intends to engage in conduct that is not protected by the narrow exception to the registration requirement contained in 7 U.S.C. § 1a(5)(C). Indeed, the dissemination of such advice appears from the record already to be the primary focus of CTS's publishing activities. The broad sweep of 7 U.S.C. §§ 1a(5)(A) & 6m(1), by their plain terms, covers impersonal—as well as personalized—advice. Furthermore, the CFTC has formally taken the position that a publisher must register as a "commodity trading adviser" before disseminating impersonal commodity information (assuming it is not "solely incidental" to the publisher's business). *See, e.g., In re Armstrong, Comm. Fut. L. Rep. (CCH)* ¶ 25,657, at 40,149 (CFTC 1993) (stating that the reg-

istration requirement for publishers of impersonal commodity advice—here, two advisory newsletters and two recorded telephone newsline services—was unaffected by the Supreme Court's decision in *Lowe v. Securities & Exchange Commission,* 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985)), *vacated on other grounds sub nom. Armstrong v. Commodity Futures Trading Comm'n,* 12 F.3d 401 (3d Cir.1993). CTS, therefore, has properly alleged its intention to engage in conduct proscribed by the Commodity Exchange Act.

CTS has also made the necessary threshold showing of a credible threat of prosecution for its (present and/or future) violation of the Act. The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute. *See Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *see also New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 15 (1st Cir.1996) ("[C]ourts will assume a credible threat of prosecution in the absence of compelling contrary evidence."); *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1502 (10th Cir.1995) (finding a credible threat of prosecution existed because the State had "not affirmatively disavowed any intention of bringing criminal prosecution" against violators of the challenged campaign funding statute). In this case, the CFTC has in fact *enhanced* the credibility of CTS's threat of prosecution. In July 1996, the Commission launched a full-scale investigation of CTS's publishing activities in order to determine, *inter alia,* whether CTS has violated · the registration requirement of 7 U.S.C. § 6m(1). In the course of this investigation, the CFTC has subpoenaed thousands of documents and compelled various wit-

---

**3.** This test essentially incorporates the elements of the ripeness test enunciated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The *Abbott Laboratories* test calls upon courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. These stan-

dards are satisfied whenever the *Babbitt* test is met. For instance, a facial constitutional challenge presents only a legal issue—the quintessentially "fit" issue for present judicial resolution; moreover, as in *Abbott Laboratories* itself, a credible threat of criminal prosecution constitutes a hardship to the plaintiff worthy of immediate review.

nesses to testify regarding the preparation and content of CTS's publications. Meanwhile, during the pendency of this investigation, the CFTC has undertaken other similar investigations and successfully completed at least one enforcement action to punish the failure to register by a publisher of impersonal commodity advice. *See Commodity Futures Trading Comm'n v. AVCO Fin. Corp.*, No. 97 CIV 3119(JFK) (S.D.N.Y. June 29, 1998) (unreported decision). CTS has shown that it has good reason to fear prosecution for publishing impersonal commodity trading advice without registering with the Commission.

We therefore reverse the district court's ripeness holding as to Count I of the amended complaint and remand CTS's facial challenge to the district court for further consideration.[4]

### III.

We turn next to the district court's determination that CTS's as-applied challenge to the constitutionality of the registration requirement is not ripe for review. Our analysis of the justiciability of this as-applied challenge largely tracks our discussion of CTS's facial challenge.[5] In this count of its amended complaint, CTS seeks a declaratory judgment that the First Amendment protects its impersonal investment advice and that such expression cannot be regulated by 7 U.S.C. § 6a(1). The district court concluded that CTS sought a judicial

---

4. When considering a facial challenge to the overbreadth of a statute under the First Amendment, a court must determine whether the statute prohibits a "substantial" amount of protected activity or expression. *See, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129–30, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). In other words, the district court must ascertain whether the unconstitutional applications of a statute are substantially greater than the statute's legitimate sweep. *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("[W]e believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."). The relief that a court can grant is directly tied to the substantiality of the unconstitutional overbreadth. In *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), the Supreme Court stated that an unconstitutionally overbroad statute should only be invalidated "to the extent that it reaches too far, but otherwise left intact." This may be possible if a statute is amenable to a limiting construction or if it contains a severability clause. *See id.* at 506, 105 S.Ct. 2794. Partial invalidation may not be possible, however, if the legislature would not have passed the law without the unconstitutional element, or if the statute lacks a severability clause and the only way to remove the unconstitutional element is total abrogation of the statute. *See id.*

Under this framework, it might be possible in a given case for the ultimate relief available in facial overbreadth and as-applied challenges to coincide. In such a situation, a successful as-applied challenge to a statute would result in a declaration that the statute cannot be applied to the specific activity undertaken by that particular plaintiff. If the challenged statute is capable of partial invalidation, and if the plaintiff's conduct comprises the heart of the statute's "substantial" relative unconstitutionality, then a facial overbreadth challenge to that statute might result in a partial invalidation that closely resembles the declaratory relief in the as-applied challenge.

5. The district court expressed its belief that CTS's facial challenge was nothing more than an as-applied challenge in substance. While it might be possible that the ultimate relief could coincide, as discussed *supra* at footnote 4, we think it goes too far at this point to deem CTS's two claims to be identical. The district court made no determinations regarding the relative substantiality of the registration requirement's overbreadth. The case was dismissed on ripeness grounds before this inquiry could occur. Furthermore, the district court did not analyze any provisions of the Act to see if partial invalidation was a possibility. Thus, the district court erred in regarding CTS's amended complaint as stating only a single, as-applied claim.

It is true, though, that invalidating statutes on the basis of facial overbreadth is "strong medicine that has been employed by the Court sparingly and only as a last resort." *National Endowment for the Arts v. Finley*, — U.S. —, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (quotation omitted). For this reason, it is a proper exercise of judicial restraint for courts to adjudicate as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues. *See Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 484–86, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). In other words, courts should not invalidate a statute to an extent greater than is necessary to decide the individual controversy before it. If the district court were to grant relief on CTS's as-applied claim, it would not need to reach the facial challenge.

answer to the same question animating the CFTC's investigation: Was CTS covered by the registration requirement of 7 U.S.C. § 6m(1)? Because of the identity of the issues, the district court decided that judicial resolution of CTS's constitutional challenge was premature and must await the Commission's determination of coverage.

■ In determining whether an issue is ripe for judicial review, courts examine "both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration'" at this time. *Ohio Forestry Ass'n, Inc. v. Sierra Club,* —— U.S. ——, ——, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). We believe that the district court's ripeness determination overlooked CTS's stated intention to violate the Commodity Exchange Act by increasing its publication of impersonal information concerning commodity trading. CTS plainly falls within the definition of a "commodity trading advisor" as a publisher of advice regarding the "value of or the advisability of trading in" commodity options. 7 U.S.C. § 1a(5)(A)(i). The only question, it seems, is whether those activities are "solely incidental" to its business. CTS is a financial publisher with an emphasis in commentary on commodity markets and trading; CTS's current level of activity would likely preclude invocation of the "solely incidental" exception, and certainly any intended increase in activity in these areas would render the exception even less applicable. The factual question of whether CTS is covered by the registration requirement (as interpreted by the CFTC) thus falls away, and it becomes unnecessary for CTS to await the predestined agency resolution (which could take

anywhere from months to years to occur, if at all).[6] This kind of challenge is uniquely "fit" for judicial resolution.

Furthermore, CTS has alleged sufficient hardship to ripen its as-applied challenge into a justiciable case or controversy. The effects of the registration requirement have been "felt in a concrete way" by CTS. *Reno v. Catholic Social Servs., Inc.,* 509 U.S. 43, 57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). *Cf. Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (holding that a challenge to an administrative regulation was not yet ripe because the regulation's impact was not "felt immediately by those subject to it in conducting their day-today affairs"). Indeed, apart from any intention to expand its publications' impersonal advice, CTS already has been forced to dilute the content of its publications, halt its direct-mail advertising, and suspend the development of new publications relating to commodity trading based on the CFTC's interpretation of the registration requirement. One of CTS's columnists has even refused to write for its publications out of fear of prosecution. In addition, CTS presents a cognizable harm by pleading that it wishes to engage in proscribed expression but is deterred from doing so by the CFTC's interpretation of the Commodity Exchange Act (and the resulting reasonable fear of prosecution). This kind of self-censorship is a substantial hardship within the meaning of the *Abbott Laboratories* test. *See, e.g., Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 13 (1st Cir. 1996) ("[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression or foregoes expression in order to avoid enforcement consequences.").

---

**6.** Because CTS concedes that at least its intended activities would be covered under the Commodity Exchange Act, there is no need to await the Commission's predictable coverage determination. The Supreme Court's decision in *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), and our decision in *American International Trading Co. v. Bagley,* 536 F.2d 1196 (7th Cir.1976), do not mandate otherwise. In those cases, the plaintiffs contested whether the relevant statutes covered their activities, and the courts were therefore

reluctant to intercede in that dispute prior to an agency resolution of the issue. In this case, by contrast, CTS concedes coverage (at least with regard to its intended future activities), and the albeit-limited record supports this concession. Therefore, the fear of short-circuiting an agency's determination of coverage is dissipated. We emphasize, though, that the CFTC is not precluded from defending the constitutionality of the registration requirement—either facially or as-applied to CTS's activities—simply because of our coverage determination.

Finally, CTS's costly and time-consuming compliance with the Commission's investigation constitutes an additional burden that we must factor into our evaluation of hardship in this case. *See Socialist Workers Party v. Attorney Gen. of the United States*, 419 U.S. 1314, 1319, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Marshall, J., as Circuit Justice) (finding that a justiciable controversy existed where the Government's investigative activities created a substantial and realistic threat of chilling the plaintiffs' First Amendment freedoms).

The Supreme Court's decision in *Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), provides helpful guidance in our inquiry. In that case, a certified public accountant sought a declaratory judgment that a Florida agency's rule against in-person solicitation by accountants violated the First and Fourteenth Amendments. The plaintiff alleged that but for the ban on such expression he would seek clients through personal solicitation. *See id.* at 764, 113 S.Ct. 1792. The Supreme Court did not question the ripeness of the plaintiff's claim and proceeded to adjudicate the case on the merits because of his alleged intention to violate the administrative rule. The district court in the instant case sought to distinguish *Edenfield* because, supposedly in contrast to CTS, the plaintiff in that case "sought to engage in First Amendment activity in *violation* of the challenged administrative rule (a clearly ripe controversy)." The district court, as we have discussed, did not credit CTS's allegations that it—like the accountant in *Edenfield*—desired to engage in conduct in violation of the Commodity Exchange Act. Review of CTS's challenge is not premature because there is no real dispute that the speech that CTS wishes to publish would not qualify for the "solely incidental" exception to the Act's coverage (and thus no need to wait for an agency determination on the matter). We conclude, therefore, that CTS has alleged a justiciable as-applied challenge to the registration requirement.

### IV.

For the foregoing reasons, we reverse the district court's holding that CTS's amended complaint did not present a justiciable case or controversy. We therefore remand the case to the district court for consideration of the merits of CTS's claims.