**COMMODITY FUTURES TRADING COMMISSION, Plaintiff–Appellee–Cross–Appellant,**

v.

**Anthony VARTULI, Defendant–Appellant–Cross–Appellee,**

**AVCO Financial Corp., J. Michael Gent, Defendants.**

**Docket Nos. 98–6280, 98–6281.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 13, 1999

Decided: Sept. 22, 2000

Michael E. Schoeman, Schoeman, Marsh & Updike, LLP, New York, N.Y. (David Black, of counsel), for Defendant–Appellant–Cross–Appellee Anthony Vartuli,

Martin B. White, Commodities Futures Trading Commission (Daniel R. Waldman, General Counsel, J. Douglas Richards, Deputy General Counsel), for Plaintiff–Appellee–Cross–Appellant Commodity Futures Trading Commission.

Before: VAN GRAAFEILAND, CALABRESI and SACK, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge, concurs in Parts I and IV and concurs in the result as to Parts II and III.

SACK, Circuit Judge:

The Commodity Futures Trading Commission (the "Commission" or the "CFTC"), an independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (the "CEA"), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*, brought a civil enforcement action in the United States District Court for the Southern District of New York against defendants AVCO Financial Corp., Anthony Vartuli and J. Michael Gent. In its complaint, the Commission claimed that the defendants had violated the CEA by man-

ufacturing, selling and advertising a computer program called "Recurrence," which the defendants fraudulently claimed provided profitable trading opportunities for its purchasers and users in the market for currency futures. The Commission sought a permanent injunction barring future violations of the CEA by the defendants; awards of disgorgement, restitution, and rescission; and civil monetary penalties.

Subsequent to the commencement of the Commission's enforcement action, AVCO filed a voluntary petition in bankruptcy. The district court (John F. Keenan, *Judge*) ruled, however, that the bankruptcy filing did not stay the Commission's action because the Commission was seeking to enforce its regulatory power and the action was therefore exempt from the automatic stay under 11 U.S.C. § 362(b)(4). *See CFTC v. Avco Fin. Corp.,* 979 F.Supp. 232, 235 (S.D.N.Y.1997) (*"Avco I "*). When AVCO nevertheless failed to appear, a default judgment was entered against it. The district court then conducted a bench trial—which, pursuant to Fed.R.Civ.P. 55(b)(2), was in the form of an inquest as to AVCO because of its default—in order to make the findings of fact and conclusions of law necessary to determine whether and to what extent to impose injunctive relief against the defendants and to determine appropriate ancillary relief, if any. After trial, the district court entered judgment against AVCO and Vartuli on all three counts of the Commission's complaint. *See CFTC v. Avco Fin. Corp.,* 28 F.Supp.2d 104, 122 (S.D.N.Y.1998) (*"Avco II "*). The complaint against Gent was dismissed in its entirety. *See id.* The court issued a permanent injunction against AVCO and Vartuli and ordered the disgorgement of the profits that they had garnered from the sale of Recurrence. *See id.* at 120–21. Vartuli appealed. The Commission cross-appealed on the issue of the size of the disgorgement award.

Because we agree that AVCO and Vartuli violated the CEA, we affirm the district court's holding to that effect, although on somewhat different grounds. Because the conduct enjoined by the district court included the dissemination of Recurrence as speech and the district court did not first engage in prior restraint analysis, however, we conclude that the injunctive relief granted by the district court is in part unconstitutional, and to that extent we reverse and remand for the injunction to be modified. On remand we also direct the district court to determine whether an issue identified in Part II of this opinion, below, relating to whether customers of AVCO were "clients" under the applicable statutory language, was raised before it, and, if it was, to decide that issue in the first instance. We affirm the award of disgorgement.

## BACKGROUND

The facts relating to this appeal, which are not substantially in dispute, are described extensively in *Avco II.* In brief, the defendant Anthony Vartuli incorporated the Taurus Group, later renamed AVCO Financial Corp., in 1987. AVCO's corporate purpose, according to its certificate of incorporation, was "to provide investment advice in stocks, options and commodities." In 1989 AVCO, of which Vartuli was the sole shareholder, began marketing a set of materials called the "Recurrence" system, which Vartuli had developed with defendant Gent. Five versions of Recurrence were eventually produced (Recurrence I–V), the first two in book form and the latter three as computer software on disk. In this appeal, we are concerned principally with the computerized versions.

AVCO told its customers to obtain a market reporting service to feed current market prices for Swiss franc future contracts (or, for Recurrence V, Japanese yen future contracts) into a computer loaded with the Recurrence program. Recurrence would then analyze the transactions taking place in the futures market and give the user instantaneous "buy" or "sell" signals. AVCO claimed that following these signals would enable Recurrence

users to trade futures contracts profitably. According to the parties' Joint Pretrial Order in the district court:

> The Defendants' customers pay AVCO's licensing fee, and, if they wish to follow the instructions given by the Defendants' system themselves, install the Defendants' computer program on their personal computers, procure a market reporting service to feed current market prices to the computer, and then act on the instructions given by the Defendants' system.

In addition to selling the system, AVCO gave occasional supplemental advice to Recurrence users by telephone. It also provided customers with a list of "authorized brokers" who were willing to trade for the account of an AVCO customer using the Recurrence system if the purchaser of the system did not want to order each specific transaction him or herself.

AVCO advertised the Recurrence system, which sold for prices ranging from $1500 for Recurrence I to $4500 for Recurrence IV, extensively. The advertising made clear that Recurrence was being sold as a system for trading commodities futures, and that for the system to function properly its commands were to be followed explicitly. A Recurrence ad run in the *1995 Partnership Packet*, for example, said:

> "You'll be advised on what pattern is present, at what price to buy or sell, at what price to place your protective stop, and where to take profits. . . . All the trader needs to do is call [his or her] broker and place the appropriate trades."

Recurrence also told potential purchasers:

> [Recurrence's] message gives you a *specific* buy or sell recommendation, as well as a specific stop *and* profit objective. You just call your broker and give the complete order (you can even read the instructions right off your screen) and then sit back and watch as Recurrence monitors the market and your position in real time.

(Emphasis in original.) An ad run in multiple editions of *Futures Magazine* informed prospective customers that they must "follow the signals with no second-guessing." And an advertisement that appeared in various editions of various publications warned that a Recurrence customer had to be possessed of a "lack of ego" in order for him or her to "begin taking profits immediately."

From 1991 to 1997, AVCO's advertisements for the Recurrence system claimed some remarkable results. AVCO advertised that "Recurrence III makes money automatically," "the system turned a $10,000 trading account into a $544,704 fortune-a return of 833% per year," and, "If you're serious about making money trading the markets, see the enclosed verified performance summary showing how Recurrence IV turned $2,500 into well over $130,000 trading only one Swiss Franc futures contract." But AVCO's claims were based on computer-generated hypothetical use of the system rather than actual trades, a fact not disclosed in the advertisements.

In addition to mass-media advertisements, AVCO also sent promotional materials to prospective customers. The order form that accompanied these materials contained a disclaimer that began:

> **CFTC Disclosure:** While the numbers used in this literature are "Real Time Data" the CFTC requires the following disclaimer on all market related literature. Hypothetical or Simulated performance results have certain limitations. Unlike an actual performance record, simulated results do not represent actual trading.

(Emphasis in the original.)

AVCO's advertisements were successful. Total revenue from sales of the system grew to more than four million dollars.

The results of actual trading using the Recurrence system did not live up to AVCO's promotional claims. The district

court found that trading as directed by the Recurrence system, whether conducted by individuals or "authorized broker[s]," resulted in substantial losses. *Avco II*, 28 F.Supp.2d at 113. Even after customers complained to AVCO and Vartuli that Recurrence's performance had been poor, they continued to make claims about the system's extraordinary profitability.

The Commission filed a three-count complaint against AVCO, Vartuli and Gent. Count I charged the defendants with solicitation fraud in violation of Section 4b(a)(i) of the CEA, 7 U.S.C. § 6b(a)(i). Count II charged the defendants with fraud by a commodity trading advisor ("CTA") and fraudulent advertising under Section 4*o* (1) of the CEA, 7 U.S.C. § 6*o* (1). Count III charged the defendants with having failed to register AVCO as a CTA as required by Section 4m(1) of the CEA, 7 U.S.C. § 6m(1). The complaint charged Vartuli and Gent both as controlling persons of AVCO and as aiders and abettors of AVCO's conduct with respect to each count.

Employing a preponderance of the evidence standard, the district court found against AVCO and Vartuli on all three counts. *See AVCO II*, 28 F.Supp.2d at 115–20. The court dismissed all of the charges against Gent on the ground that he was not responsible for the false and misleading claims or the other actions with which AVCO was charged. *See id.*

On Count I, the court found that AVCO's representations about the Recurrence system's level of risk and past performance were material, false, misleading, and made with scienter. *See id.* at 115–18. While the defendants maintained that the basis for their performance claims were legitimate "hypothetical" trading models, the district court found that AVCO customers reasonably believed that the statistics provided in the Recurrence advertisements referred to the results of actual trades and as such were false and misleading. *Id.* at 115–16. The court also concluded that those representations were made in connection with futures trading. *See id.* at 116–17. AVCO and Vartuli were held directly liable for the representations, and Vartuli was also held liable as a controlling person of AVCO and as an aider and abettor. *See id.* at 117–18.

On Count II, the court determined that AVCO was in fact a CTA even though it had never registered as one, and that AVCO's actions were therefore subject to the regulations governing CTA conduct. *See id.* at 118–19. The court then concluded that AVCO had employed "devices, schemes or artifices to defraud" and "practices or courses of business which operate as a fraud or deceit upon" its customers in violation of 7 U.S.C. § 6*o* (1) and 17 C.F.R. § 4.41(a). *Id.* at 119. It further held that AVCO had failed to accompany the hypothetical performance statistics used in its promotional materials with the warning required by 17 C.F.R. § 4.41(b). *See id.* Vartuli was again held liable as a controlling person and as an aider and abettor. *See id.* at 120.

Because the district court concluded that AVCO was a CTA and AVCO concededly never registered with the Commission, the district court held that AVCO was liable on Count III, failure to register as a CTA. *See id.* Once again, Vartuli was held liable as a controlling person and as an aider and abettor. *See id.*

After entering judgment against them, the court permanently enjoined AVCO and Vartuli from acting as CTAs, trading in commodities, and soliciting customers for commodities trading. *See id.* at 120–21. AVCO and Vartuli were originally held to be jointly and severally liable for disgorgement in the amount of $4,148,572, the gross revenue received by the defendants for the sale of Recurrence. *See id.* at 121. The award was later reduced to $701,534 to reflect only the defendants' net income on such sales. *See CFTC v. Avco Financial Corp.*, No. 97 CIV. 3119(JFK), 1998 WL 524901, at *1, 1998 U.S. Dist. LEXIS

12996, at *4 (S.D.N.Y. Aug.21, 1998) ("*Avco III* ").

On appeal, Vartuli argues that the misrepresentations made by AVCO were not made "in connection with" the purchase or sale of commodity futures contracts and were therefore not covered by the anti-fraud provisions of the CEA; that a software publisher such as AVCO does not fall within the statutory definition of a CTA; that if software publishers are CTAs then the CEA licensing scheme violates the First Amendment; that AVCO's customers were not "clients" covered by 7 U.S.C. § 6*o* (1) and that in any case they were provided with the disclosure language specified in Regulation 4.41 under the CEA; and that Regulation 4.41 unconstitutionally compels speech. He does not dispute his liability as a controlling person of AVCO or as an aider and abettor; we therefore do not address Vartuli's and AVCO's actions, or liability, separately. *See Guttman v. CFTC*, 197 F.3d 33, 39–40 (2d Cir.1999) (discussing vicarious liability under the CEA); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 n. 4 (2d Cir.2000) (issues not sufficiently raised in the briefs will normally not be addressed by this Court on appeal).

## DISCUSSION

We review the district court's findings of fact for clear error, and its conclusions of law *de novo*. *See, e.g., Counihan v. All-state Ins. Co.*, 194 F.3d 357, 360 (2d Cir. 1999).

### I. Count I: Solicitation Fraud

Count I of the Commission's complaint against the defendants charged them with committing commodities fraud in violation of Section 4b(a)(i) of the CEA, 7 U.S.C. § 6b(a)(i). Section 6b(a) makes it unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person ... (i) to

cheat or defraud or attempt to cheat or defraud such other person." *Id.*

▇ Vartuli argues that the district court erred in holding the defendants liable for commodities fraud under § 6b because any misrepresentations that were made in the advertising for Recurrence were made in connection with AVCO's sale of its software, not in connection with transactions in commodity futures engaged in by AVCO customers. We find this argument unpersuasive.

"By its terms, Section [6]b is not restricted ... to instances of fraud or deceit 'in' orders to make or the making of contracts. Rather, Section [6]b encompasses conduct 'in or in connection with' futures transactions. The plain meaning of such broad language cannot be ignored." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110–11 (2d Cir.1986) (ellipsis in original) (quoting *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96, 103–04 (7th Cir.1977)). And liability under § 6b explicitly extends beyond "member[s] of the contract market" to "any person" engaging in conduct "in connection with" futures transactions. 7 U.S.C. § 6b(a); *Saxe*, 789 F.2d at 111.

Recurrence was sold by the defendants as a system for trading in futures contracts, a "currency trading system." The purpose and function of the software was to advise users what futures transactions to execute. AVCO implored users to "follow" signals from Recurrence "with no second-guessing." Purchasers of Recurrence were instructed by the defendants to undertake specific transactions entirely in reliance on it. Thousands of such transactions were in fact undertaken. Misrepresentations about Recurrence, the way it functioned, the risks involved in using it, and the results it would produce were necessarily misrepresentations about all the trades directed by the Recurrence system. The intended and direct link between the advertisements and the currency trading rendered any misrepresentations in the advertising "in connection with" the suggested futures transactions.

*Saxe* is instructive. There, according to the facts accepted for purposes of that appeal, the plaintiff opened a commodities trading account in reliance upon defendant's statement that a particular commodities trader was "an experienced commodities trading advisor, which [sic] would use a sophisticated computerized trading program custom-tailored to [the plaintiff's] investment objectives." *Saxe*, 789 F.2d at 110. In so guiding his client, the defendant, a stock broker, "misrepresent[ed] the degree of risk and highly speculative nature of commodities trading when he reassured appellant that commodities trading would be a safe, non-speculative investment." *Id.* "[M]isrepresentations about the risks of commodities trading affected all subsequent trades made on appellant's behalf." *Id.* The defendant's statement was therefore made "in connection with" commodities transactions, even though the defendant did nothing more than recommend an advisor who eventually placed trades for the plaintiff. *See id; see also Hirk*, 561 F.2d at 103, *cited with approval in Saxe*, 789 F.2d at 110 (fraud in solicitation of trading account is "in connection with" futures transactions for purposes of § 6b).

The connection between the asserted misrepresentations and the trading seems to us to be, if anything, clearer here than in *Saxe*. The misrepresentations in AVCO's advertisements directly reflected on the reliability of the suggestions made by Recurrence about specific futures trades, whereas in *Saxe* the misrepresentation concerned a broker who in turn made independent recommendations about commodity transactions.

The Fifth Circuit recently affirmed a CFTC ruling similar to the district court's in the case at bar. The case began as an administrative enforcement action brought by the Commission against a seller of software bearing a striking resemblance to Recurrence. *See R & W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 173 n. 35 (5th Cir.2000) ("*R & W*") (referring to the mis-

representations as found by the district court in *Avco II* as "nearly identical" to the misrepresentations in the sale of software in the case before the court). The court deferred to the CFTC's view in the administrative proceedings, *id.* at 173, and therefore adopted the CFTC's "not unreasonable" contention that advice is "in connection with" futures trading if it "relates to the risk of the trading and the primary purpose of purchasing the advice is to execute trades," *id.* Because the "expensive software [at issue] had no purpose except as a device for choosing which trades to make," fraud in the sale of that software was fraud "in connection with" commodities futures transactions. *Id.* at 172–73. The same is true here.

We therefore affirm the district court's finding that AVCO's representations about the Recurrence system were made in connection with futures trading. And because the statements that AVCO made about Recurrence were false, misleading and made with scienter—findings that are not in dispute on appeal—we hold that the defendants' conduct violated § 4b(a)(i) of the CEA, 7 U.S.C. § 6(b)(a)(i).

## II. Count II: Fraud by a Commodity Trading Advisor

### A. *Statutory and Regulatory Framework.*

Count II of the complaint alleges that AVCO violated § 4*o*(1) of the CEA, 7 U.S.C. § 6*o*(1), and Commission Rules 4.41(a) and (b), 17 C.F.R. § 4.41(a)-(b). Section 6*o*(1) makes it unlawful for CTAs or their associates:

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

Regulation 4.41(a) prohibits CTAs from advertising in a manner that violates § 6o (1). Regulation 4.41(b) prohibits any person from "present[ing] the performance of any simulated or hypothetical commodities account of a CTA" without a specified disclaimer.

Vartuli argues that AVCO cannot have violated § 6o (1) and Regulation 4.41(a) because those provisions apply only to CTAs, and AVCO does not meet the statutory definition of a CTA. He further argues that we could not conclude that AVCO is a CTA without rendering the CEA unconstitutional because the act contains a provision requiring all CTAs to register. Vartuli asserts that this registration provision, if applicable to AVCO, violates the First Amendment.

We conclude that AVCO meets the statutory definition of a CTA and affirm the district court's holding that AVCO violated the fraud provisions applicable to CTAs. Those provisions apply to CTAs irrespective of whether they are "exempt from registration under the Act," 17 C.F.R. § 4.41(c)(2), so the question of whether the CEA's registration requirement would be unconstitutional as applied to AVCO is independent from the question of whether AVCO is a CTA for purposes of the remainder of the Act, including 7 U.S.C. § 6o (1). *Cf. New York Currency Research Corp. v. CFTC*, 180 F.3d 83, 89 (2d Cir.1999) (holding that registering as a CTA and acting as a CTA are independent requirements, both of which must be met for certain provisions of the CEA to apply). We address the constitutional issues particular to the antifraud provisions of § 6o (1) and Regulation 4.41 in Section E, below, and separately discuss the registration requirement in Part III.

*B. AVCO is a Commodity Trading Advisor*

A CTA is defined in § 1a(5)(A) of the CEA, 7 U.S.C. § 1a(5)(A).

[T]he term "commodity trading advisor" means any person who–

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in—

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market; . . . or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

Sections 1a(5)(B) and (C) combine to exclude certain classes of people and entities from this definition, however. Relevant for our purposes, they exclude both "any news reporter, news columnist, or news editor of the print or electronic media," § 1a(5)(B)(ii), and "the publisher or producer of any print or electronic data of general and regular dissemination, including its employees," § 1a(5)(B)(iv), provided that "the furnishing of such [advisory services as described in § 1a(5)(A) ] . . . is solely incidental to the conduct of their business or profession," § 1a(5)(C).

■ There is no dispute that as the district court found, AVCO advised others through the electronic media, for profit, as to "the value or the advisability of trading in" futures contracts for Swiss francs and Japanese yen. *Avco II*, 28 F.Supp.2d at 118. "Throughout the day, in response to market conditions, Recurrence provided specific buy, sell, stop and profit objective recommendations to customers." *Id.* AVCO therefore falls within the primary definition of a CTA: It engaged in the business of advising others, through Recurrence, as to the value or the advisability of trading in futures contracts, *i.e.*, it told customers whether to buy or sell yen or Swiss franc futures.

■ The question thus becomes whether AVCO fits within the relevant CEA exclusions from the definition of

CTA. Based upon the plain language of the statute it does not. The electronic data it produced were not "general[ly] and regular[ly] disseminat[ed]." § 1a(5)(B)(iv). And the information about the currency futures markets provided by Recurrence was not "solely incidental" to the conduct of AVCO's business, § 1a(5)(C); it *was* AVCO's business.

Vartuli relies on *Lowe v. SEC,* 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), to argue that one of the exclusions must nonetheless apply. In *Lowe,* the Securities and Exchange Commission attempted to enjoin the defendant, a former investment adviser whose license had been revoked for criminal misconduct, from publishing a semimonthly newsletter containing investment advice and commentary. The defendant argued that the SEC could not force it to register in order to publish its newsletter because the registration provision of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–3(c), only applied to "investment advisers," and the definition of "investment adviser" specifically excluded "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." *Id.* at 203–04, 105 S.Ct. 2557.

After an extended analysis of the legislative history of the relevant provisions of the Investment Advisers Act, the Supreme Court concluded that it was required to interpret them "to keep the Act free of constitutional infirmities." *Id.* at 207, 105 S.Ct. 2557. The Court therefore read the Investment Advisers Act's exclusion from registration to cover the defendant, and thereby avoided the question of whether the registration provisions constituted an unconstitutional prior restraint on speech. *Id.* at 204–05, 105 S.Ct. 2557.[1] The Court concluded:

> As long as the communications between petitioners and their subscribers remain entirely impersonal and do not develop into the kind of fiduciary, person-to-person relationships that were discussed at length in the legislative history of the Act and that are characteristic of investment adviser-client relationships, we believe the *publications are,* at least presumptively, within the exclusion and thus not subject to registration under the Act.

*Lowe,* 472 U.S. at 210, 105 S.Ct. 2557.

Because the *Lowe* court, in order to avoid the First Amendment issue, read the Investment Advisers Act's registration provision to apply only to personalized communications, Vartuli would have us read *Lowe* to state, by implication, that we must construe the CEA's general definition of CTA to include only those who engage in personalized communications. To do otherwise, he argues, would render the CEA, or at least its registration provision (which we address separately in Section III), unconstitutional.

But *Lowe* was decided on the basis of the language and history of the Investment Advisers Act. The *Lowe* court, although interpreting the language of the Act in light of principles of constitutional law with which the drafters of the Act would have presumably been familiar, *see id.* at 204, 105 S.Ct. 2557, pointedly refused to reach the constitutional question, *see id.* at 211, 105 S.Ct. 2557. Thus *Lowe* provides us with neither a binding inter-

---

1. In discussing the particular perils posed by prior restraints, the Court cited *Near v. Minnesota ex. rel. Olson,* 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (stating that the "chief purpose" of First Amendment's press guarantee is "to prevent previous restraints upon publication") and *Lovell v. City of Griffin,* 303 U.S. 444, 451–52, 58 S.Ct. 666, 82 L.Ed. 949 (1938) ("[T]he liberty of the press became initially a right to publish without a license what formerly could be published only with one.... The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.")(internal quotation marks and emphasis omitted). *See Lowe,* 472 U.S. at 204–05, 105 S.Ct. 2557. We discuss the CEA's registration requirement in the prior restraint context in Part III, below.

pretation of the CEA, which was not the subject of the litigation before the Court, nor a constitutional analysis of the Investment Advisers Act. *See R & W*, 205 F.3d at 175 (5th Cir.2000) ("Just because *Lowe* found that the IAA excluded such publishers ... does not entail that the CEA must. The statutes are different, and *Lowe* read the statute to avoid constitutional concerns.").

We are thus left where we began, with the statutory language of the CEA. First, to fit within the exclusion, AVCO's data had to be "of general and regular dissemination." 7 U.S.C. § 1a (5)(B)(v). As the Fifth Circuit pointed out in *R & W*, the recommendations provided by software such as Recurrence are not "of general and regular dissemination" because, as the Supreme Court reasoned when analyzing the identical phrase in the Investment Advisers Act, regular dissemination requires that there be

> "... no indication that [dissemination] ha[s] been timed to specific market activity." In this case, the petitioners' recommendations were provided by software that was programmed to "speak" only when certain market conditions were met. Thus, the petitioners' recommendations were timed to particular market activity and not "regularly" disseminated.

*R & W*, 205 F.3d at 174–75 (quoting *Lowe*, 472 U.S. at 209, 105 S.Ct. 2557) (brackets in original; footnote omitted). The Fifth Circuit's observation about R & W and its product is fully applicable to AVCO, Vartuli and Recurrence.

Second, whereas the Investment Advisers Act excluded from its registration re-

quirement "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation," the CEA exclusion from its definition of a CTA applies to publishers and disseminators of information only if "the furnishing of such services ... is solely incidental to the conduct of their business or profession." § 1a(5)(C). *See Commodity Trend Serv. v. CFTC*, 149 F.3d 679, 689 (7th Cir.1998) (financial publisher similar to the plaintiff in *Lowe* "plainly falls within the definition of a 'commodity trading advisor'.... The only question ... is whether [its publishing] activities are 'solely incidental' to its business."). The publishing of Recurrence was AVCO's primary business. The exclusion therefore does not cover AVCO, and for purposes of Count II of the complaint AVCO was a CTA.[2]

### C. Fraud by a CTA Under 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41(a)

We thus agree with the district court that AVCO acted as a CTA, and on appeal Vartuli does not dispute that AVCO's conduct was fraudulent. He argues, however, that AVCO did not violate 7 U.S.C. § 6o (1) and 17 C.F.R. § 4.41(a) because those provisions apply only to frauds committed by a CTA upon a "client or participant or prospective client or participant." 7 U.S.C. § 6o (1)(A); 17 C.F.R. § 4.41(a)(1). Purchasers of Recurrence were clearly not participants or prospective participants in a commodity pool; Vartuli argues that they also were not "client[s]" of AVCO.

As the *R & W* court observed, the issue is not free from doubt. *See R & W*, 205

---

**2.** Vartuli argues that the "such services" language in § 1a(5)(C), ("unless *such services* are solely incidental to the conduct" of one's business or profession) refers to the advisory services described in § 1a(5)(A), and that those advisory services must be personalized advisory services under *Lowe*. The personalized advice language from *Lowe*, however, applies to the *exclusion* section—*Lowe* held that *impersonal* advice fit within the Investment Advisers Act's *exclusion* from its registration re-

quirement. Section 1a(5)(B), not § 1a(5)(A), is the CEA's exclusion provision. There is no basis for reading the word "personalized" into § 1a(5)(A). We therefore follow the Fifth and Seventh Circuits in holding that the definition of CTA extends to those providers of impersonal advice who do not provide such advice incidentally to their business or profession. *See R & W*, 205 F.3d at 174; *Commodity Trend Serv.*, 149 F.3d 679, 689 (7th Cir. 1998).

F.3d at 176.[3] One would not ordinarily think of a purchaser of software as a "client" of the seller of the software, even if the purpose of the software was to tell the purchaser when to buy and sell futures contracts or other securities.

The *R & W* court never reached this issue, however, because the *R & W* petitioners failed to raise it during the agency proceedings from which appeal was being taken. *Id.* We find ourselves in much the same situation. The Commission has suggested to us that the issue was not raised in the district court, and Vartuli has not established that it was. The Commission's suggestion, moreover, is strongly supported by the treatment of the concept of "client" by the district court in *Avco II.* The court simply replaced the word "client" with "customer" when discussing the statute, giving the impression that the distinction between the two words and its significance had not been argued before it. *See Avco II*, 28 F.Supp.2d at 119.

The district court was right to ignore the issue if it was not litigated before the court. *See Acosta v. Artuz*, 221 F.3d 117, 122 (2d Cir.2000). And "[i]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Maska U.S., Inc. v. Kansa General Ins. Co.*, 198 F.3d 74, 79–80 (2d Cir.1999) (citation and internal quotation mark omitted). *See also Gurary v. Winehouse*, 190 F.3d 37, 44 (2d Cir.1999) ("Having failed to make the present argument to the district court, plaintiff will not be heard to advance it here.").[4]

We therefore decline to reach this question, at least at this time.

We are, however, remanding this case to the district court for other purposes. With what is perhaps a superabundance of caution, we therefore direct the district court to review its own records and recollections to determine whether the argument as to the scope of the term "client" was presented to it. If, and only if, the argument was previously raised, the district court, not having addressed this issue in its decisions thus far, should proceed to address and decide it.

*D. Fraud Under 17 C.F.R. § 4.41(b)*

17 C.F.R. § 4.41(b)(1) provides that:

No person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a commodity pool operator, commodity trading advisor, or any principal thereof, unless such performance is accompanied by [a specified disclaimer].

The regulation further requires that the disclaimer be "prominently disclosed." 17 C.F.R. § 4.41(b)(2). It applies to "any . . . advertisement . . . including the texts of . . . mass media presentations." 17 C.F.R. § 4.41(c)(1).

It is undisputed that AVCO presented the performance of hypothetical or simulated accounts in advertisements without including the required disclaimer. The district court also found that while AVCO

**3.** The Fifth Circuit said:

The petitioners' argument regarding § [6]*o* . . . finds superficial support in cases such as *Lowe*, which distinguished between the impersonal publisher-subscriber relationship and "the investment adviser-client" relationship. *Lowe*'s distinction was made based on the [Investment Advisers] Act and not the CEA. However, even the CEA makes a distinction between clients and subscribers. For example, § [6]*o* and Rule 4.41(c) apply only to clients, while Rule 4.33(a) specifically applies to clients and subscribers.

*R & W*, 205 F.3d at 176 (quoting *Lowe*, 472 U.S. at 210, 105 S.Ct. 2557) (footnote omitted).

**4.** "This rule is not an absolute bar to raising new issues on appeal," and the decision to disregard it "is discretionary with the panel," *Greene v. United States*, 13 F.3d 577, 586 (2d Cir.1994), but in the present case no persuasive reason for our doing so has been proffered, and any ruling on the matter would require an examination of facts that should have been performed in the first instance by a district court.

did include the disclaimer in its promotional materials, it was not "prominently" placed therein. We see no reason to disturb that finding. The disclaimer appears on a page separate from the page containing the representations to which it was meant to apply, it was labeled "**CFTC Disclosure**," and it was introduced by the sentence, "While the numbers used in this literature are 'Real Time Data' the CFTC requires the following disclaimer on all market related literature." The district court was not clearly in error in perceiving the intent of this phrasing to be to mislead prospective customers into believing that the disclaimer was not applicable to the statistics provided by AVCO, having been included as a mere bureaucratic formality. *See Avco II*, 28 F.Supp.2d at 119–20. The presentation of the disclaimer seems plainly to have been designed to convey to the reader that the warning was pro forma and, as such, not to be taken seriously. AVCO's failure to include the disclaimer in its advertisements, and its failure to display it prominently and unequivocally in its promotional materials, violated § 4.41(b).

### E. Constitutional Issues

The district court concluded that treating AVCO as a CTA, and therefore enjoining and sanctioning the defendants under 7 U.S.C. § 6*o* (1) for the fraud in which the defendants engaged, avoided constitutional infirmity because Recurrence "constituted personalized investment advice." *AVCO II*, 28 F.Supp.2d at 119. The emphasis on "personal" advice comes from *Lowe*. 472 U.S. at 191–96, 105 S.Ct. 2557. *Lowe*'s holding was based on the Investment Advisers Act, not the Constitution. It therefore does not provide a framework for analysis of the constitutional issues raised on this appeal.

We are also not as certain as was the district court that AVCO provided "personalized investment advice." The advice was not personal in the sense that the defendants learned about the needs, resources and sophistication of individual clients and gave individualized advice based upon that information. *Cf. Lowe*, 472 U.S. at 191–96, 105 S.Ct. 2557 (discussing personal nature of the investment adviser's relationship with his or her clients in the context of the legislative history of the Investment Advisers Act of 1940).[5] And the computerized advice disseminated by means of Recurrence did not give the defendants or their agents the opportunity to use their physical presence for purposes of intimidation, fraud, overreaching, or abuse, a danger specific to face-to-face communications that may allow particularly close regulation of in-person interactions. *Cf. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).[6]

---

5. *Lowe*, 472 U.S. at 210, 105 S.Ct. 2557, held:

 As long as the communications between petitioners and their subscribers remain entirely impersonal and do not develop into the kind of fiduciary, person-to-person relationships that were discussed at length in the legislative history of the Act and that are characteristic of investment adviser-client relationships, we believe the publications are, at least presumptively, within the exclusion and thus not subject to registration under the [Investment Advisers] Act.

6. *Ohralik* dealt with lawyers' in-person solicitation of clients. The Supreme Court observed:

 The State's perception of the potential for harm in circumstances [involving personal solicitation by personal injury lawyers] is well founded. The detrimental aspects of face-to-face selling even of ordinary consumer products have been recognized and addressed by the Federal Trade Commission, and it hardly need be said that the potential for overreaching is significantly greater when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person. Such an individual may place his trust in a lawyer, regardless of the latter's qualifications or the individual's actual need for legal representation, simply in response to persuasion under circumstances conducive to uninformed acquiescence.

 *Ohralik*, 436 U.S. at 464–65, 98 S.Ct. 1912 (footnotes omitted).

But we agree with the district court nonetheless that there are no constitutional impediments to the court's judgment in this respect. Count II of the complaint asserts, the district court found, and we agree,[7] that the defendants "made false and misleading representations to customers regarding the past profitability and track record of Recurrence in an effort to induce customers to purchase the program and follow Recurrence's recommendations." *Avco II*, 28 F.Supp.2d at 119. It has long been understood that such "[f]rauds may be denounced as offenses and punished by law." *Schneider v. State*, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

▮▮▮ Moreover, Count II charges the defendants with "engaging in fraudulent sales practices and fraudulent advertising and failing to give the disclosure statement" in the course of promoting the Recurrence product. The speech that is the target of Count II is thus not statements made *by* Recurrence, but those made in the advertisements *for* Recurrence. These communications about Recurrence did "no more than propose a commercial transaction," between AVCO and its prospective customers. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)). They were, therefore, commercial speech, which "[t]he Constitution . . . accords a lesser protection . . . than [it does] to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). It has long been firmly established that "[f]or commercial speech to come within [the protection of the First Amendment], it at

least must . . . not be misleading." *Id.* at 566, 100 S.Ct. 2343. The misleading statements that were the subject of the CFTC's attack in Count II were therefore not protected by the First Amendment.

▮▮▮ Vartuli also argues in his and AVCO's defense that § 4.41(b)'s requirement that a disclaimer accompany all presentations of hypothetical or simulated data compels speech in violation of the First Amendment. In the commercial speech context, however, "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). The disclosure requirement at issue here was reasonably related to the government's interest in preventing consumers from being deceived by misleading hypothetical statistical presentations that, as Congress observed, could lead to inefficiencies in the commodities markets that are contrary to the public interest. *See generally* 7 U.S.C. § 5 (describing legislative findings).

Whether the fraudulent speech about Recurrence disseminated by AVCO, a CTA, could be sanctioned is an issue entirely different from whether AVCO, as the proprietor and disseminator of Recurrence, could be required to register with the federal government as a CTA or could be enjoined from publishing its software. Those are the questions to which we are about to turn.

We note first, however, our colleague Judge Van Graafeiland's declination to join in this Part II and the following Part III of this opinion because "we ought not to pass on questions of constitutionality unless such adjudication is unavoidable," post

---

7. It is arguable that we are required to review the district court's findings underlying its determination of the constitutional aspects of its judgment *de novo* rather than for clear error. *See, e.g., Bose Corp. v. Consumers Union of* *U.S., Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). We therefore note that even upon such a review, we would agree and affirm.

at 113, quoting *Department of Commerce v. United States House of Representatives,* 525 U.S. 316, 343–44, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). We do not understand how we can dispose of Vartuli's assertions that enjoining and sanctioning the defendants under 7 U.S.C. § 6*o* (1) is contrary to the First Amendment, as we do in Part II, or that the requirement that AVCO and Vartuli must register as CTAs with the CFTC is contrary to the First Amendment, as we do in part III, or indeed how we can arrive at the result with which Judge Van Graafeiland concurs, without "pass[ing] on questions of constitutionality."

### III. Count III: Registration as a Commodity Trading Advisor

*A. Liability for Failure to Register*

Count III of the complaint charges AVCO with violating 7 U.S.C. § 6m(1) by failing to register as a CTA. The relevant provision of the statute reads:

> It shall be unlawful for any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator.

Because the district court concluded that AVCO was a CTA, and because it was undisputed that AVCO has not registered with the CFTC and has used the mails, the district court decided that AVCO had violated § 6m(1). *See Avco II,* 28 F.Supp.2d at 120. The court did not address the constitutionality of the registration requirement. *See id.*

■■■ As spelled out in Section II.B, above, we agree with the district court that AVCO acted as a CTA. By the terms of the statute, it was therefore required to register as one. But the CEA's registration requirements insofar as they are a prerequisite for constitutionally protected speech are a quintessential form of prior restraint. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (citing cases). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). They carry "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Vartuli argues that Recurrence was constitutionally protected speech and that any registration requirement applicable to it therefore must be analyzed as a prior restraint.

■■■ We note in this connection that the electronic form in which Recurrence supplies information does not affect the constitutional analysis. *Leaves of Grass* is protected speech irrespective of whether it is communicated by print on leather-bound pages or by electrons translated to words and read from a cathode-ray tube. A prior restraint against speech is no less suspect because the speech is conveyed electronically rather than on paper in a book or magazine.

■■■ And we are not convinced that insofar as Recurrence generates *speech*—a question we will address shortly—the speech that issues from it is "commercial," as the Supreme Court has used that term. Unlike *advertising* for Recurrence, which was the subject of Count II of the complaint and Section II of this opinion, the output of the Recurrence program does "more than propose a commercial transaction" between speaker and listener. *Virginia Pharmacy,* 425 U.S. at 762, 96 S.Ct. 1817 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)). It guides the user in making investments. The "commonsense differences between speech that does 'no more than propose a commercial transaction,' and other varieties" of speech, *Virginia Pharmacy,* 425 U.S. at 771 n. 24, 96

S.Ct. 1817 (internal citation omitted), permit an attenuated form of First Amendment protection for commercial speech. Because of the speaker's unique ability to ascertain the truth about the product or service he or she is selling, and the peculiar heartiness of commercial advertising, commercial speech may be more comprehensively regulated than may other forms of speech. *See id.* at 772 n. 24, 96 S.Ct. 1817. While these "commonsense differences" characterize advertising for the Recurrence system, they do not apply to statements relating to the futures markets generated and conveyed by the system itself.[8]

Moreover, fraud is not an element of Count III of the complaint. Whereas past fraud may ordinarily be punished without provoking First Amendment concerns, *see Schneider*, 308 U.S. at 164, 60 S.Ct. 146; *R & W*, 205 F.3d at 175 ("[L]iability for fraud would not run afoul of the First Amendment.") (footnote and citations omitted), the same is not true of measures such as registration requirements that restrict speech in an attempt to guard against future misrepresentation or abuse. Even in "commercial speech cases [the Court] ha[s] consistently rejected the

proposition that such drastic prohibitions on speech may be justified by a mere possibility that the prohibited speech will be fraudulent." *Lowe*, 472 U.S. at 235, 105 S.Ct. 2557 (White, J., concurring in the result) (citing *Zauderer*, 471 U.S. 626, 105 S.Ct. 2265; *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); and *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)).

We also note that for the reasons set forth in Section II.E., above, we doubt that the defendants, through Recurrence, were giving "personalized advice," for whatever ramifications that conclusion might have for constitutional analysis. *Compare Lowe*, 472 U.S. at 207–08, 105 S.Ct. 2557 (Stevens, J.) (using personal/impersonal advice distinction to interpret Investment Advisers Act so as to avoid constitutional issues) *with Lowe*, 472 U.S. at 233–36, 105 S.Ct. 2557 (White, J., concurring) (arguing that same result should be reached on First Amendment grounds).

The First Amendment issues arise, however, only if AVCO is being sanctioned for having engaged in or is being prevented from freely engaging in constitutionally protected speech.[9] The

---

8. Commercial speech has occasionally been said to be "expression related solely to the economic interests of the speaker and its audience." *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm.*, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). That description is overbroad for the purposes of this analysis. Speech may be related solely to economic interests and not share the "commonsense differences" from other communications, *Virginia Pharmacy*, 425 U.S. at 771 n. 24, 96 S.Ct. 1817, upon which the lesser protection for commercial speech is based. Use of the *Central Hudson* description as a definition of commercial speech might, for example, permit lessened First Amendment protection and increased governmental regulation for most financial journalism and much consumer journalism simply because they are economically motivated, a notion entirely without support in the case law. *See e.g., Thornhill v. Alabama*, 310 U.S. 88, 102–03, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (speech about labor dispute protected even though economi-

cally motivated); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 787, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (Brennan, J., dissenting) ("[T]his Court has consistently rejected the argument that speech is entitled to diminished First Amendment protection simply because it concerns economic matters or is in the economic interest of the speaker or the audience.") (citing, in addition to *Thornhill, Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); *American Federation of Labor v. Swing*, 312 U.S. 321, 325–326, 61 S.Ct. 568, 85 L.Ed. 855 (1941); and *Abood v. Detroit Bd. of Education*, 431 U.S. 209, 231–232, 231 n. 28, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)).

9. Vartuli does not purport to bring an overbreadth challenge against the CEA's registration requirement. We therefore need not and do not decide whether, in light of the nature of Recurrence's "speech," overbreadth analysis in this case would be appropriate. *Cf. Los Angeles Police Dep't v. United Publ. Corp.*, 528 U.S. 32, 120 S.Ct. 483, 489, 145 L.Ed.2d 451

First Amendment prohibits governmental abridgement of "the freedom of speech." We do not think that Recurrence in the form it was sold and marketed by the defendants was "speech" of the sort thus protected.

AVCO sold Recurrence not as a learning program, or an editorial, or an informational newsletter, but as a "system" and "trading program." "The system [was] automatic," with "NO complicated rules to follow. NO calculations to make. NO fundamentals to analyze. And NOTHING to interpret." Users were told they must "follow the signals with no second-guessing." When Recurrence displayed a "sell" signal, the customer was supposed to sell; when it flashed "buy" the customer was supposed to buy. He or she was expected to make no decision of his or her own. The system was advertised and marketed on the basis that it was to be trusted implicitly and followed explicitly. The customer or "client" was to be an automaton, mechanically following Recurrence's commands. Indeed, the defendants argued to the district court that the Commission's evidence about Recurrence's performance was flawed because it was based on users who had not "follow[ed] the system."

Language was involved in conveying the Recurrence commands to traders, to be sure. But as Professor Kent Greenawalt has pointed out, "Language serves a variety of functions, only some of which are covered by the special reasons for freedom of speech." Kent Greenawalt, *Speech and Crime*, 4 Am. B. Found. Res. J. 645, 784 (1980). The language at issue here was to be used in an entirely mechanical way, as though it were an audible command to a machine to start or to stop. "[T]he point ... [was] not to convey information or to assert values." *Id.* at 680. It was to induce action without the intercession of the mind or the will of the recipient.

None of the reasons for which speech is thought to require protection above and beyond that accorded to non-speech behavior—the pursuit of truth, the accommodation among interests, the achievement of social stability, the exposure and deterrence of abuses of authority, personal autonomy and personality development, or the functioning of a democracy, *see generally* Kent Greenawalt, *Free Speech Justifications*, 89 Colum. L.Rev. 119 (1989)—is implicated by the communications here in issue, and none counsels in favor of treating the Recurrence communications at issue as protected "speech." From a First Amendment perspective, Recurrence, as sold, did not materially differ from a system in which Recurrence's signals electronically triggered trades. In other words, the fact that the system used words as triggers and a human being as a conduit, rather than programming commands as triggers and semiconductors as a conduit, appears to us to be irrelevant for purposes of this analysis.

In selling Recurrence in the manner in which it was sold, as an automatic trading system, AVCO acted as a CTA without engaging in constitutionally protected speech. For that it could, consistent with the First Amendment, be required to register, and its failure to do so can constitutionally be punished. The defendants are of course entitled to constitutional protection, but the applicable protection is that which would protect AVCO, Vartuli and their non-speech behavior from overreaching by the government, under the Due Process Clause of the Fifth Amendment, for example, not that which would protect their speech under the First Amendment. And Vartuli claims no such intrusion on his or AVCO's rights.

To be sure, some purchasers of Recurrence doubtless used it as no more than a

(1999) ("Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we

have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.' " (citations omitted.))

provider of information and advice. Recurrence communications to those customers may well have been "speech," and protected speech at that. But AVCO was properly required to register for its non-speech activities, such as the sale of Recurrence as the automatic system for currency trading it was intended to be. The fact that AVCO may also have engaged in protected speech does not make the requirement that it register to carry on its non-speech business any the less constitutionally permissible.

Finally, a caveat. Statements in the form of orders or instructions are strikingly common: Commands by military officers to their subordinates, by restaurant patrons to their waiters, by doctors to their patients, by political or religious leaders to their devoted followers. We do not think and do not mean to suggest by our holding today that such communications "can claim . . . talismanic immunity from constitutional limitations." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963). The uses of language are subtle, complex and infinitely variable. Any assertion that a statement like or unlike the "buy" and "sell" instructions issued by a Recurrence-loaded computer is not fully protected by the Constitution should be subjected to careful and particularized analysis to insure that no speech entitled to First Amendment protection fails to receive it.

We affirm the district court's ruling that AVCO and Vartuli were guilty of violating 7 U.S.C. § 6m(1) by not registering.

*B. Injunction Against Acting as a CTA Unless Registered*

As part of the relief granted to the Commission, however, the district court permanently enjoined AVCO and Vartuli from "[a]cting as [ ] commodity trading advisor[s] . . . and from using the mails or any means or instrumentality of interstate commerce in connection with activity as [ ] CTA[s] unless registered with the Commodity Futures Trading Commis-sion." From our holding in Part II, it is clear that publishing Recurrence alone— *i.e.*, not as an automatic trading system— would qualify as "acting as a commodity trading advisor." The district court enjoined the defendants from acting as such unless they registered with the CFTC. Under the injunction as it currently stands, therefore, the defendants would be required to register with the Commission to publish Recurrence even if it were being used soley as speech, if for example it were being advertised, sold and used as an academic commentary on the commodities markets. Thus formulated, the injunction together with the registration requirement may act as a prior restraint on constitutionally protected speech for which the district court did not perform any constitutional analysis. We therefore remand for the district court to limit the injunction to the dissemination of systems for the automatic trading of futures contracts.

We do not hold that Vartuli or AVCO may never be required to register as a CTA even to engage in protected speech. We observe only that requiring either to do so would be a prior restraint subject to especially careful judicial scrutiny, and that "the barriers to prior restraint remain high." *Nebraska Press Ass'n*, 427 U.S. at 561, 96 S.Ct. 2791.

Should AVCO or Vartuli wish to disseminate a program, whether similar to or dissimilar from Recurrence, as speech—conveying information or opinions about the futures markets or other subjects, for example—without registering with the CFTC, the district court, at the behest of the CFTC, Vartuli, or others may consider what judicial action, if any, would be appropriate and consistent with or required by the First Amendment. We do not consider the propriety of such conduct by the defendants or any judicial response to it now, however, as those issues are not before us.

**IV. The Cross Appeal**

The CFTC cross appeals from the judgment insofar as the district court set

the disgorgement award for which AVCO and Vartuli are jointly and severally liable at $701,534, which the court concluded was the cumulative profit generated by AVCO from 1993 through 1997. *See Avco III,* 1998 WL 524901, at *1, 1998 U.S. Dist. LEXIS 12996, at *4. The Commission argues that the award "should be based on AVCO's gross receipts, with no deductions for business expenses."

"The decision to order disgorgement of ill-gotten gains, and the calculation of those gains, lie within the discretion of the trial court, which must be given wide latitude in these matters." *SEC v. Lorin,* 76 F.3d 458, 462 (2d Cir.1996) (per curiam) (internal quotation marks omitted). Here, after "carefully review[ing]" the submissions of the parties and "keeping in mind that disgorgement is a nonpunitive equitable remedy meant to deprive wrongdoers of ill-gotten gains," the district court ordered Vartuli and AVCO to disgorge $701,-534. *Avco III,* 1998 WL 524901, at *1, 1998 U.S. Dist. LEXIS 12996, at *4. We conclude that such decisions are wisely left to the discretion of the district courts, and that the district court did not abuse its discretion here.

## CONCLUSION

Because AVCO and Vartuli committed fraud in connection with commodities futures transactions, we affirm the judgment of the district court as to Count I. Because AVCO and Vartuli fit within the statutory definition of a CTA, and committed fraud as such, and because they failed to include the required disclaimer along with their presentation of hypothetical trading activity, we affirm the judgment of the district court as to Count II, although we direct the district court to review whether the issue of whether a Recurrence customer is a "client" under 7 U.S.C. § 6*o* (1) was raised before it at trial and to decide that issue if it was. *See* Section II.C above. Because the conduct on the basis of which the Commission seeks to punish AVCO for failing to register was not "speech" for purposes of the First Amendment, we affirm the judgment of the district court as to Count III. Because the injunction issued in response to Count III enjoins constitutionally protected speech, however, we remand to the district court so that it may limit the injunction in accordance with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring in the result:

I concur without reservation in my colleagues' disposition of Count I and IV. As to the remainder of the opinion, I concur solely in the result. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable." *Department of Commerce v. United States House of Representatives,* 525 U.S. 316, 343–44, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).